1

2   I. Scott Bogatz                          Roberto J. Kampfner
    Nevada Bar No. 3367                      California State Bar No. 179026
3   BOGATZ & ASSOCIATES, P.C.               WHITE & CASE LLP
    3455 Cliff Shadows Parkway, Suite 110   633 West Fifth Street, Suite 1900
4   Las Vegas, NV 89129                      Los Angeles, CA  90071
5   Telephone:  (702) 776-7000              Telephone: (213) 620-7700
    Facsimile:  (702) 776-7800              Facsimile:   (213) 452-2329
6   Email: sbogatz@isbnv.com                Email: rkampfner@whitecase.com

7   Counsel for Debtor and Debtor-in-Possession,   Counsel for Southwest Desert Equities, the
8   C-SWDE382, LLC                          parent of the Debtor

9

10              UNITED STATES BANKRUPTCY COURT

11                    DISTRICT OF NEVADA

12

13  In re:                          )   Case No.
                                    )
14                                  )   Chapter 11
    C-SWDE382, LLC, a Nevada limited liability )
15  company,                        )
                                    )
16          Debtor and Debtor-in-Possession.)   **DISCLOSURE STATEMENT FOR
                                    )   DEBTOR'S AMENDED PLAN OF
17                                  )   REORGANIZATION DATED DECEMBER
                                    )   1, 2010**
18                                  )
                                    )
19                                  )
                                    )
20                                  )
                                    )
21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS
(continued)

**Page**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................1

II.     EXPLANATION OF CHAPTER 11 ..................................................................................3
        A.      Overview of Chapter 11 ..................................................................................3
        B.      Plan of Reorganization ..................................................................................3
        C.      Confirmation of a Plan of Reorganization ....................................................4

III.    DEFINITIONS ....................................................................................................................6

IV.     SUMMARY OF THE PLAN AND DISTRIBUTIONS UNDER THE PLAN ..................6
        A.      Summary of Plan ............................................................................................6
        B.      Distributions under the Plan ........................................................................13

V.      VOTING INSTRUCTIONS ..............................................................................................13

VI.     BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING ..........14

VII.    THE PLAN ........................................................................................................................16
        A.      Treatment of Unclassified Claims Under the Plan ......................................16
        B.      Summary of Classification and Treatment of Claims Under the Plan ........17
        C.      Implementation of the Plan ..........................................................................19

VIII.   CONDITIONS PRECEDENT ..........................................................................................24
        A.      Condition to Confirmation ..........................................................................24
        B.      Conditions to Effectiveness ........................................................................24
        C.      Waiver of Conditions ..................................................................................24
        D.      Failure of Conditions ..................................................................................25

IX.     DISPUTED CLAIMS ......................................................................................................25
        A.      Objection Deadline ......................................................................................25
        B.      Prosecution of Disputed Claims ..................................................................25
        C.      Entitlement to Plan Distributions upon Allowance ....................................25

X.      EFFECT OF CONFIRMATION ......................................................................................25
        A.      Revesting of Assets ......................................................................................25
        B.      Discharge ......................................................................................................26

XI.     JURISDICTION ................................................................................................................26

XII.    AMENDMENT AND WITHDRAWAL OF PLAN ..........................................................26
        A.      Amendment of the Plan ................................................................................26
        B.      Revocation or Withdrawal of the Plan ........................................................27

**TABLE OF CONTENTS**
(continued)

| | | | Page |
|---|---|---|---|
| XIII. | TAX CONSEQUENCES OF THE PLAN | | 27 |
| XIV. | RISK FACTORS | | 27 |
| XV. | LIQUIDATION ANALYSIS | | 29 |
| XVI. | ACCEPTANCE AND CONFIRMATION OF THE PLAN | | 30 |
| | A. | Acceptance of the Plan | 30 |
| | B. | Confirmation | 31 |
| XVII. | MISCELLANEOUS PROVISIONS | | 32 |
| | A. | Filing Objections to Claims | 32 |
| | B. | Holding of, and Failure to Claim, Undeliverable Distributions | 32 |
| | C. | Fractional Amounts | 33 |
| | D. | Ex Parte Relief | 33 |
| | E. | Binding Effect | 33 |
| | F. | Exculpation | 33 |
| | G. | Governing Law | 34 |
| | H. | Modification of Payment Terms | 34 |
| | I. | United States Trustee Fees | 34 |
| | J. | Computation of Time | 34 |
| | K. | Final Decree | 34 |
| XVIII. | RECOMMENDATION AND CONCLUSION | | 35 |

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

I.      **INTRODUCTION**

This Disclosure Statement (the "Disclosure Statement") has been prepared by the above-captioned debtor (the "Debtor"), in connection with the solicitation of acceptances of the Debtor's Plan of Reorganization Dated December 1, 2010 (the "Plan").  The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor, typical of holders of Claims and equity interests, to make an informed judgment about the Plan.  An acceptance or rejection of the Plan must be in writing and may only be made by completing the ballot that accompanies the Plan.

In order for your vote to be counted, it must be *received* no later than 5:00 p.m. (prevailing Pacific Time) on January 14, 2011 at the following address:

Bogatz & Associates, P.C.
c/o Rikki Poll
3455 Cliff Shadows Parkway, Suite #110
Las Vegas, NV 89129

The Debtor reserves the right, but not the obligation, to extend the voting deadline and to count any votes received thereafter.

This Disclosure Statement includes (among other things), a summary of the Chapter 11 Case, a description of the Claims against and equity interests in the Debtor, a summary of the Plan, a discussion of the Plan's feasibility, and a liquidation analysis setting forth what holders of a Claim against or equity interest in the Debtor would recover if the Debtor was liquidated immediately under Chapter 7 of the Bankruptcy Code.

**UPON BANKRUPTCY COURT APPROVAL OF THE PLAN, THE PLAN WILL BE BINDING UPON ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS.**

The Debtor requests that you vote promptly for the Plan upon carefully reviewing the Plan.

If you have any questions concerning the procedures for voting, or any questions concerning your treatment under the Plan, please contact Amanda Stewart of Focus Property Group at (702) 242-4949.

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

THE PLAN IS THE GOVERNING DOCUMENT.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT THE DEBTOR'S ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED.  THE FINANCIAL INFORMATION IS UNAUDITED. NONE OF THE FINANCIAL ANALYSIS CONTAINED IN THIS DISCLOSURE STATEMENT IS CONSIDERED TO BE A "FORECAST" OR "PROJECTION" AS TECHNICALLY DEFINED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE USE OF THE WORDS "FORECAST," "PROJECT," OR "PROJECTION" WITHIN THE DISCLOSURE STATEMENT RELATES TO THE BROAD EXPECTATIONS OF FUTURE EVENTS OR MARKET CONDITIONS AND QUANTIFICATIONS OF THE POTENTIAL RESULTS UNDER THOSE CONDITIONS.

THE PROFESSIONALS REPRESENTING THE DEBTOR HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  YOU SHOULD CONSULT WITH YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND RELATED MATTERS CONCERNING YOUR CLAIM OR INTEREST.

EACH CREDITOR AND EQUITY INTEREST HOLDER IS URGED TO REVIEW THE PLAN IN FULL BEFORE VOTING ON THE PLAN TO ENSURE A COMPLETE UNDERSTANDING OF THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND OTHER PARTIES IN INTEREST AND FOR THE SOLE PURPOSE OF ASSISTING THEM IN MAKING AN INFORMED DECISION ABOUT THE PLAN.  NO

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION DATED DECEMBER 1, 2010

PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONJUNCTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR IN THE BALLOTS. IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

## II.    EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor in possession attempts to reorganize its business for the benefit of the debtor, its creditors and other parties in interest. The Debtor has not yet commenced bankruptcy proceedings. However, the Debtor expects to file a "prepackaged" bankruptcy after the solicitation of votes on the Plan is completed if all of the Classes of creditors set forth below approve the Plan.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. Here, the Debtor fully expects to remain in possession of its assets throughout its Chapter 11 Case.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts to collect or recover prepetition claims from the debtor or to otherwise interfere with, or exercise control over, the debtor's property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

### B.    Plan of Reorganization

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in the debtor. **In this case, the**

**Debtor is soliciting its Plan prior to commencing its bankruptcy proceeding. In such a case, section 1125 of the Bankruptcy Code requires that a debtor comply with applicable non-bankruptcy law in connection with its solicitation of the Plan. If no applicable non-bankruptcy law exists, section 1126(b) provides that a solicitation must comply with the disclosure requirements set forth in section 1125 of the Bankruptcy Code concerning disclosure statements. The Debtor does not believe that there is an applicable non-bankruptcy law governing the solicitation of this Plan. Accordingly, this Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.** In short, the Debtor believes that this Disclosure Statement provides information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical investor to make an informed judgment about the Plan.

The Debtor expects to file the Plan concurrently with the commencement of its bankruptcy case and your vote on the Plan will be binding, even after the Debtor's bankruptcy case has been commenced.

### C.    Confirmation of a Plan of Reorganization

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" of creditors test and be "feasible." The "best interests" test generally requires that the value of the consideration to be distributed under a plan to the holders of claims or interests in the debtor is not less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization. **With the exception of approval of the Plan by all impaired classes, the Debtor believes that the**

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

**Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors test and the feasibility requirement.**

Chapter 11 does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization in order for the bankruptcy court to determine that the class has accepted the plan. Rather, a particular class will be determined to have accepted the plan if the court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. **Importantly, only the holders of Claims who actually vote will be counted as either accepting or rejecting the Plan.**

In addition, classes of claims or interests in the debtor that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Conversely, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in cash on the effective date of the plan.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all classes of impaired claims and equity interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or equity interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured

claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class. **The Debtor believes that the Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting Class of equity interests, and can therefore be confirmed, if necessary, over the objection of such of Class. The Debtor will not attempt to confirm the Plan over the non-acceptance of any creditor Class.**

### III.    DEFINITIONS

All capitalized terms used herein, but not defined herein shall have the meaning given to such terms in the Plan. If a term is not defined herein or in the Plan, but is defined in the Bankruptcy Code, such term has the meaning given to that term in the Bankruptcy Code unless the context of the Disclosure Statement requires otherwise. References to a code section are references to the Bankruptcy Code, except as otherwise stated.

### IV.    SUMMARY OF THE PLAN AND DISTRIBUTIONS UNDER THE PLAN

This Section provides a summary of the Plan and of how Claims against and equity interests in the Debtor are classified and treated under the Plan. The descriptions set forth below are merely summaries and, in the event of an inconsistency with the Plan, the terms of the Plan will govern. Please refer to Section VII hereof for a more detailed discussion of the Plan.

#### A.    Summary of Plan

The Plan is not complicated. The Debtor is the owner of certain real property totaling 5.29 acres located in what is to be the Kyle Canyon Gateway North Master Plan in Las Vegas, Nevada (the "Property"). The Property serves as collateral for a promissory note (the "Note") in the amount of $2,580,000 issued by the Debtor's parent for the benefit of the lenders named therein (the "Lenders"). Under the Plan, the Property will be returned to the Lenders in full satisfaction of the

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

Note and in lieu of foreclosure. Such return will occur by canceling the equity interests in the Debtor currently held by the Debtor's parent (the "Parent") and issuing "Class A Membership Interests" in the reorganized Debtor to the Lenders on a pro rata basis. In exchange for the cancellation of its common equity, the Parent will receive "Class B Membership Interests" in the Debtor, which will permit the Parent to receive only limited distributions from the Debtor, as described in more detail below. The Parent, as the holder of the Class B Membership Interests, will have no voting rights other than with regard to the dissolution of the reorganized Debtor as permitted by the New Operating Agreement. The purpose of the Plan is to effectively transfer ownership of the Property to the Lenders without the necessity and expense of a foreclosure as well as to provide a structure and mechanism to protect and improve and fully realize the value of the Property for the Lenders.

After the effective date of the Plan (the "Effective Date"), the Debtor will be governed by a new operating agreement (the "New Operating Agreement"), which has been attached as an exhibit to the Plan. *Please note that what follows is a summary of some of the important points of the New Operating Agreement and is not intended to supersede any of the terms thereof. In the event of a conflict between this Disclosure Statement, the Plan and the New Operating Agreement, the terms of the New Operating Agreement shall govern. We urge you to read the New Operating Agreement before voting for the Plan.*

Under the terms of the New Operating Agreement, the management of the new limited liability companies will be vested in a "Steering Committee" and a "Manager." The Steering Committee shall be initially comprised of five (5) individuals, four (4) of which shall be elected by the Lenders and one (1) of which such shall be elected by the Manager. A list of the initial members of the Steering Committee will be filed with the Bankruptcy Court and served upon the Lenders prior to the commencement of any confirmation hearing with respect to the Plan. The Steering Committee's main function is to (a) approve an annual project budget and any amendments thereto which require additional capital contributions and (b) approve the annual business plan of the Debtor and any material modifications thereof. Further, the Steering Committee must approve any action of

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

the Manager that would cause the reorganized Debtor to be materially out of compliance with an approved budget.

The day-to-day management of the reorganized Debtor shall be the responsibility of the Manger. Further, the Manager of the Debtor shall be an affiliate of LST Investments, LLC, a Nevada limited liability company dba Clayton Mortgage and Investment ("Clayton"). Clayton is not affiliated with or related to the Debtor or the Parent, and is currently the servicer of the Note. The Manager will be paid an annual "Management Fee" by the Debtor equal to 0.5% of the original principal amount of the Note to manage the reorganized Debtor. In addition to the Management Fee, prior to the Petition Date, the Parent has reimbursed Clayton for some of its out-of-pocket legal and other professional fees incurred in connection with the restructuring of the Note. Pre-petition, certain affiliates of Parent who were borrowers under various loans (including the Note) serviced by Clayton commenced litigation in the Eighth Judicial District Court, Clark County, Nevada, case no. A-10-609073-C (the "Litigation") whereby the borrowers were seeking, among other things, information relating to the identity and contact information of the Lenders, which Clayton disputed. Recognizing the costs and risks of litigation, the parties thereto negotiated a settlement pursuant to which the parties agreed to negotiate proposed plans of reorganization to restructure each of the loans and generally release each other from various claims. Additionally, the Parent and certain affiliates agreed to reimburse Clayton for its expenses and compensate it for servicing the various loans pre-petition. Furthermore, to compensate Clayton for its efforts in assisting with the restructuring of the Note through the Plan, the Parent will pay Clayton $6,450 on the Effective Date.

Notwithstanding any of the foregoing, there are certain "Major Decisions" that the reorganized Debtor cannot make without the consent of 65% of the holders of the Class A Membership Interests with respect to which votes are cast (i.e., the membership interests to be held by the Lenders). A comprehensive list of Major Decisions is set forth in Section 3.7(b) of the New Operating Agreement and includes, without limitation, (a) the sale of any Property, except where such sale is for fair market value (as determined by an MAI certified appraiser) and will result in the return of all capital invested by the Class A Members after the Effective Date and all accrued interest thereon, (b) any financing, refinancing or acquiring of material indebtedness by the company that

exceed 10% of the original principal amount of the Note, (c) the acquisition of any asset by the reorganized Debtor with a value in excess of $50,000, (d) any change in the nature of the principal business of the reorganized Debtor and (e) the issuance of additional membership interests in the Debtor or the creation of additional classes of membership interests.

The operations of the reorganized Debtor shall be funded by voluntary capital contributions (each an "Additional Member Contributions") from the holders of Class A Membership Interests on a pro rata basis on the terms and conditions set forth in the New Operating Agreement.  Among other things, Additional Member Contributions shall be requested by the Manager in accordance with the Debtor's Steering Committee approved budget (as the same may be amended from time to time).  Additional Member Contributions shall bear interest of 8% per annum until returned.

In the event that a Class A Member fails to fund its pro rata share of a requested Additional Member Contribution, the remaining Class A Members shall be entitled to contribute the difference to the Debtor (a "Supplemental Capital Contribution") in an amount equal to their ratable share of the Class A Members prepared to contribute such Supplemental Capital Contribution.  Supplemental Capital Contributions shall bear interest at a rate of 20% per annum until returned, which consists of an 8% return plus a 12% premium.  If the Supplemental Capital Contribution provided by the Class A Members is insufficient to cover the shortfall, the Class B Members shall be entitled to contribute the remaining shortfall.

The New Operating Agreement also requires the Parent, as the Class B member, to perform certain obligations.  Among other things, the Parent is required to contribute $26,346 as a "Class B Member Upfront Payment."  The Class B Member Upfront Payment is in an amount reasonably determined by the Class B Member and the Manger to pay certain costs relating to the Property from October 31, 2009 through the end of the 2011 calendar year and to reimburse Clayton and certain Lenders for some of the costs relating to the Property and the enforcement of the Note and the related loan documents.  Specifically, the Class B Member Upfront Payment shall be used by the Debtor to pay the following:  real property taxes attributable to the Property for the period of October 31, 2009 through December 31, 2011,  management fees (due under the New Operating

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

Agreement) from May 1, 2010 through December 2011, and fees and expenses previously incurred by Clayton in connection with the enforcement of the Note and related loan documents.

If the amount of the carry costs associated with the Debtor for the period from the Effective Date through the end of the 2011 calendar year exceeds the amount of the Class B Member Upfront Payment allocated to the payment of such carry costs, then the difference shall be funded through additional capital contributions to be made by Class A members.

A portion of the Class B Member Upfront Payment in the amount of $16,744 shall be deemed to constitute the "Class B Member Initial Capital Contribution" and shall be returned as set forth below. The remainder of the Class B Member Upfront Payment will not be deemed a capital contribution or loan by the Parent to the Debtor and shall not be reimbursed to the Parent.

In addition, after conformation of the Plan, the Parent, as Class B member, shall also be required to aid the Manager in formulating the initial annual budget and business plan for the Debtor, and thereafter annually proposing modifications to the Debtor's budget and business plan were appropriate, as well as using its best efforts to maintain the Property in good condition and repair and in compliance with all applicable laws, rules, permits, regulations, zoning conditions and entitlements. The Debtor must maintain its water rights in order to maximize the value of the Property, and the Parent has the expertise to preserve and maintain such rights in an efficient and cost-effective manner. If the Parent fails to perform its obligations to the Debtor, it could lose the Class B Member Interest as more particularly set forth in the New Operating Agreement.

Upon the sale of Property or other distribution of cash from Debtor operations, the net proceeds shall be paid:

- first to the makers of Supplemental Capital Contributions in an amount equal to all unreturned Supplemental Capital Contributions together with simple interest at a rate of 8% per annum until all such unreturned Supplemental Capital Contributions (together with accrued interest) shall have been returned in full;

- second, ratably, in proportion to the amount then due, to the makers of Additional Member Contributions and the Parent in the amount of all unreturned Additional Member Contributions and the unreturned Class B Member Initial Contribution together with simple interest of 8% per annum until all unreturned Additional Member Contributions and the Class B Member Initial Contribution are returned in full;

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

LOSANGELES 885312 v2

- third, until the holders of Class A Membership Interests have received an amount equal to the Waterfall Increase Amount (as defined below), (a) 90% to the holders of Class A Membership Interests on a pro rata basis; provided that the pro rata distributions of the Class A members shall be adjusted so that the makers of Supplemental Capital Contributions receive an additional 12% annual return at the expense of the Class A members whose failure to make Additional Member Contributions necessitated the making of Supplemental Capital Contributions, and (b) 10% to the Parent; and

- fourth, 70% to the holders of Class A Membership Interests on a pro rata basis and 30% to the Parent.

The term "Waterfall Increase Amount" means an amount equal to the sum of the original principal amount of the Note and an annual assessment equal to 1% of such amount, prorated monthly, from the Effective Date through the date of the sale of the Property.

The Class A Membership Interests shall be subject to certain restrictions on transfer set forth in the New Operating Agreement.  Among other things, the Class A Membership Interests will not be registered or publically traded and can only be transferred in compliance with securities laws.  Further, the Class A Membership Interests are subject to rights of first refusal in favor of existing holders of Class A Membership Interests and the Manager may refuse to admit a new member to the Debtor if it believes that doing so would not be in the best interests of the Debtor.

The Debtor may, but is not required, to hire an affiliate of the Parent to serve as the real estate broker in connection with a sale of the Property under an industry standard brokerage and commission agreement.  If the Debtor does not hire the affiliate of the Parent, however, the affiliate of the Parent (which is a licensed commercial real estate broker) shall retain a non-exclusive right to market the Property as part of a proposed master plan development or other property assemblage and, if it is the procuring cause of the sale, will be paid an industry standard commission as a share of the commission otherwise to be paid to the listing broker (if any) and other participating brokers (if any).

*Finally, the Plan contains a release of Claims against the Guarantor under the Guarantee (the "Guarantor Claims") by all Lenders voting in favor of the Plan.  As a result, a Lender's vote in favor of the Plan also constitutes a voluntary release by such Lender of all Guarantor Claims. Subject to the next paragraph, all Lenders that do not affirmatively vote in favor of the Plan will retain all of their rights to assert their Guarantor Claims against the Guarantor.*

*Notwithstanding the foregoing, the Note is held by more than one natural person and section 645B.340 of the Nevada Revised Statutes (the "Nevada Statute"), provides, among other things, that, in such cases, persons holding 51% or more of the beneficial interests in a note may be able to bind the remaining holders to a release of any or all of the obligations relating to such note. Here, if Lenders holding more than 51% of the beneficial interests in the Note accept the Plan and release the Guarantor, the Nevada Statute may permit the Debtor and the Guarantor to argue that the releases contained in the Plan are binding upon all of the Lenders, including those that did not accept the Plan. There is no guarantee that 51% of the beneficial interests in the Note will vote in favor of the Plan and, even if that is the case, the Plan does not affect and the Bankruptcy Court will not adjudicate any rights that the Debtor, the Guarantor or the Lenders may have under the Nevada Statute. Accordingly, any determination of whether the Nevada Statute binds Lenders that did not accept the Plan to the releases will be determined, if necessary, in a forum other than the Bankruptcy Court, most likely in a Nevada state court. The substance of any such determination is unclear and cannot be predicted with certainty.*

The Plan is the result of arms' length negotiations between the Debtor, the Parent and Clayton and carefully balances the interests of all parties. Under the Plan, the Lenders will control the Debtor, receive the large bulk of distributions from the sale of the Property and receive the benefits of the Parent's real estate expertise and the Class B Member Upfront Payment. The Parent, on the other hand, will retain the ability to receive small distributions if the Property can be successfully sold.

The alternative to the Plan is for the Lenders to foreclose on the Property. In such event, the Lenders will own the Property as tenants in common and will have no feasible legal structure for maintaining and selling the parcels to third parties. Further, the Lenders will not have the benefit of the Parent's real estate expertise and will not receive any funding from the Parent. Under these circumstances, the Debtor believes that the Plan is in the best interest of the Lenders and urges you to vote for the Plan.

## B. Distributions under the Plan

The following is a summary of the Distributions under the Plan. Claims (except Administrative Claims and Claims of Professionals) against and equity interests in the Debtor will receive Distributions under the Plan as set forth below:

| Classification | Type of Claim | Treatment |
|---|---|---|
| Class 1 | Property Tax Claims<br><br>**Estimated amount of Property Tax Claims: $0** | On the Effective Date, holders of Allowed Property Tax Claims will receive Cash in the amount of their Allowed Property Tax Claims plus interest at the applicable statutory rate. |
| Class 2 | Note Claims<br><br>**Estimated amount of Note Claims: $2,580,000** | On the Effective Date, each holder of an Allowed Note Claim shall receive, in complete satisfaction of such Claim and all related Liens, its Pro Rata Share of 100% of the Class A Membership Interests. Such membership interests shall have all of the rights and obligations set forth in the New Operating Agreement. |
| Class 3 | Old Membership Units | On the Effective Date and upon the payment of the Class B Member Upfront Payment, the Old Membership Units shall be exchanged for the Class B Membership Interests. Such membership interests shall have all of the rights and obligations set forth in the New Operating Agreement. |

## V.    VOTING INSTRUCTIONS

**IT IS IMPORTANT THAT YOU EXERCISE YOUR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.** If you are or may be entitled to vote on the Plan, you have been sent a ballot (the "Ballot") and instructions for voting with this Disclosure Statement. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot sent to you with this Disclosure Statement.

To simplify the voting procedure, Ballots have been sent only to all known holders of Claims and equity interests, including Disputed Claims to which objections may be filed once the Chapter 11 Case has been commenced. The Bankruptcy Code and the Bankruptcy Rules provide that only the holders of Allowed Claims (or Claims which are deemed Allowed) and holders of Allowed equity interests are entitled to vote on the Plan. The Bankruptcy Court may temporarily allow a Disputed Claim to which an objection has been filed for purposes of voting on the Plan. Therefore,

although the holders of Disputed Claims to which an objection has been filed will receive Ballots, these votes will not be counted unless the Bankruptcy Court temporarily allows such Claims for purposes of voting on the Plan.

If a party in interest is a member of more than one Class, it will receive a Ballot for each Class. **IF YOU ARE A MEMBER OF MORE THAN ONE CLASS, YOU MUST FILL OUT AND RETURN ALL BALLOTS SENT TO YOU FOR YOUR VOTE TO COUNT IN EACH CLASS.**

**AN ACCEPTANCE OR REJECTION OF THE PLAN MAY BE VOTED BY COMPLETING THE BALLOT THAT ACCOMPANIES THE PLAN AND THE DISCLOSURE STATEMENT, AND RETURNING IT NO LATER THAN 5:00 P.M. (PREVAILING PACIFIC TIME) ON JANUARY 14, 2011 TO:**

> Bogatz & Associates, P.C.
> c/o Rikki Poll
> 3455 Cliff Shadows Parkway, Suite #110
> Las Vegas, NV 89129

**IF YOUR BALLOT IS NOT RETURNED BY SUCH TIME, IT MAY NOT BE CONSIDERED. BALLOTS WHICH ARE RETURNED BUT NOT PROPERLY EXECUTED OR WHICH FAIL TO INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

## VI.    BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING

The Debtor's only asset is the Property. The Property was originally acquired by the Parent of the Debtor. The original loans obtained by the Parent to acquire the Property were later refinanced through the Note, which is attached as <u>Exhibit B</u> to the Plan. The Note is secured by the Property pursuant to a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (as amended, modified, released or assigned prior to the Petition Date the "<u>Deed of Trust</u>") dated as of October 12, 2006 and recorded in the official records of Clark County, Nevada as Instrument No. 20061120-0001103. The Property was acquired as part of a plan to acquire land to develop and entitle a master planned community commonly known as Kyle Canyon Gateway North (the

LOSANGELES 885312 v2

"Community"). Such community is being developed by Focus Investment Group, LLC (the "Developer"), which also owns a majority interest in the Parent

In the fall of 2007, the credit markets dramatically tightened. As a result, the Developer and the Parent were unable to obtain the financing required to both continue developing the Community and service the interest on the loans used to acquire the land comprising the Community, including the Note. As a result, in February of 2008, the Parent ceased paying interest on the Note, and, instead, requested that the Lenders agree to a three-year forbearance agreement, pursuant to which the Developer would continue to pay development and carry costs in respect of the Community, but not interest on the Note, which would accrue pending a sale of the Property at the conclusion of the development of the Community.

The market for real estate loans has not improved since the forbearance agreement was executed, and, in fact, has become more difficult. As a result, the Developer now believes that it can no longer fund all of the development and carry costs associated with the Property. Accordingly, the Developer and the Parent approached Clayton in 2009 and 2010 and sought to negotiate a new restructuring of the Note. After substantial negotiations, the Developer, the Parent and Clayton agreed to restructure the Note as set forth in the Plan. The Plan is the product of vigorous arms' length negotiations.

In short, and as noted above, pursuant to the Plan, the Property will be transferred to the Debtor from the Parent immediately prior to commencing this case and, on the Effective Date, the Lenders will be provided with 100% of the Class A Membership Interests in the Debtor. The Parent (and current holder of the equity in the Debtor) will be issued Class B Membership Interests upon the payment of the Class B Member Upfront Payment. Under the Plan, the Lenders will receive 90% of all distributions from the sale of the Property (after repayment of Additional Member Contributions, Supplemental Capital Contributions and the Class B Initial Capital Contribution and a return thereon, as more particularly provided in the New Operating Agreement) until they have received an amount equal to the Waterfall Increase Amount and 70% of all distributions thereafter. The Debtor's new Manager (an entity affiliated with Clayton, the servicer of the Note), with assistance from the Parent and Developer, will continue to develop the Community and entitle the

Property, but all costs incurred in connection therewith, including the carrying cost of the Property will be paid by the Debtor through voluntary additional capital contributions made by the Lenders or otherwise borrowed from third-parties; provided that the Parent shall fund all property tax payments from October 31, 2009 through December 31, 2011.

The Developer, the Parent, the Debtor and Clayton each agree that a prepackaged plan of reorganization is the best method for accomplishing the restructuring of the Property. Most importantly, the parties do not believe that state law provides a mechanism to effectively realize value from the Property. Indeed, under state law, the Lenders would likely foreclose upon the Property, which would leave them holding the Property as tenants in common. Under those circumstances, no legal framework would exist to fund carry costs and marketing expenses and for selling the Property. A prepackaged plan of reorganization solves these structural issues. Further, the Parent has agreed to make the Class B Member Upfront Payment, which it has no obligation to make in the event of a foreclosure. The Developer, the Parent, the Debtor and Clayton urge you to vote in favor of the Plan.

## VII.    THE PLAN

A copy of the Plan accompanies this Disclosure Statement as Exhibit A. The following summary of the material provisions of the Plan is qualified in its entirety by the specific provisions of the Plan, including the Plan's definitions of certain terms used below. The following is intended only to provide a general description of the Plan. For more specific information concerning the Plan, the Plan should be referenced. For an overview of the Plan, please refer to Section IV above.

### A.    Treatment of Unclassified Claims Under the Plan

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including, without limitation, Claims for Professional Fees, are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with Article 2 of the Plan and in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

### 1.    Administrative Claims

Administrative Claims other than Claims for Professional Fees shall be paid in full in Cash by the reorganized Debtor on the Effective Date, except as otherwise permitted by the Bankruptcy Code or as otherwise agreed by the reorganized Debtor and the holders of any such Administrative Claims. All requests for payment of Administrative Claims, other than requests for payment of Claims for Professional Fees, must be filed by the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Debtor or the reorganized Debtor.

### 2.    Professional Fees

Each Person seeking an award by the Bankruptcy Court of Professional Fees: (a) must file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days of the Effective Date; and (b) if the Bankruptcy Court grants such an award, it must be paid in full in Cash by the Debtor with funds contributed by the Parent in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable.  All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the requirements of the Bankruptcy Code, the Bankruptcy Rules and any applicable guidelines and with all of the terms and conditions set forth in any applicable order of the Bankruptcy Court, including, without limitation, the Confirmation Order, and all other orders governing payment of Professional Fees.

### 3.    Post-Effective Date Professional Fees

All Professional Fees for services rendered in connection with the Chapter 11 Case and the Plan after the Effective Date are to be paid by the reorganized Debtor upon receipt of an invoice for such services, or on such other terms to which the reorganized Debtor and the relevant Professional may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

### B.    Summary of Classification and Treatment of Claims Under the Plan

In accordance with section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors (except those Claims receiving treatment as set forth in Section VII(A) above) and holders of equity

interests are placed in the Classes described below for all purposes, including, without limitation, voting on, Confirmation of, and Distribution under, the Plan:

| Class 1 | Property Tax Claims | Unimpaired, deemed to accept |
| Class 2 | Note Claims | Impaired, entitled to vote |
| Class 3 | Old Membership Units | Impaired, entitled to vote |

The treatment of Claims against and equity interests in the Debtor under the Plan is set forth below and is consistent with the requirements of Section 1129(a) of the Bankruptcy Code.

### 1.    Class 1--Property Tax Claims

Class 1 consists of Property Tax Claims. Property Tax Claims are unimpaired by the Plan; consequently, the holders of Property Tax Claims are deemed to have accepted the Plan. On the Effective Date, each holder of an Allowed Property Tax Claim shall receive a single Cash payment equal to the sum of (a) its Allowed Property Tax Claim and (b) all accrued postpetition interest calculated at the rate required by applicable nonbankruptcy law.

### 2.    Class 2--Note Claims

Class 2 consists of the Note Claims. Note Claims are impaired by the Plan; consequently, the holders of Note Claims are entitled to vote on the Plan. On the Effective Date, each holder of a Note Claim shall receive, in complete satisfaction of such Claim and any Liens under the Deed of Trust securing such Claim, its Pro Rata Share of 100% of the Class A Membership Interests. Such Class A Membership Interests shall have all of the rights and obligations set forth in the New Operating Agreement.

### 3.    Class 3 – Old Membership Units

Class 3 consists of the Old Membership Units. Old Membership Units are impaired by the Plan; consequently, the holders of Old Membership Units are entitled to vote on the Plan. On the Effective Date, and upon the payment of the Class B Member Upfront Payment, the Old Membership Units shall be exchanged for the Class B Membership Interests. Such Class B Membership Interests shall have all of the rights and obligations set forth in the New Operating Agreement.

### C.    Implementation of the Plan

The following section describes the means for implementing the Plan.

      **1.**    **Issuance of Class A Membership Interests.**  On the Effective Date, the Old Membership Units shall be cancelled and the Debtor shall issue, without further order of the Bankruptcy Court or need for corporate approval, the Class A Membership Interests and the Class B Membership Interests as provided for in the Plan.

      **2.**    **Adoption of Operating Agreement.** On and after the Effective Date, and without further order of the Bankruptcy Court or need for corporate approval, the Debtor shall be governed by the New Operating Agreement and such agreement shall supersede all other operating agreements in respect of the Debtor.  The New Operating Agreement shall provide at all times that distributions from the reorganized Debtor to its members, including the holders of Class A Membership Interests and Class B Membership Interests, shall be paid <u>first</u> to the makers of Supplemental Capital Contributions in an amount equal to all unreturned Supplemental Capital Contributions together with simple interest at a rate of 8% per annum until all such unreturned Supplemental Capital Contributions (together with accrued interest) shall have been returned in full, <u>second</u>, ratably, in proportion to the amount then due, to the makers of Additional Member Contributions and the Parent in the amount of all unreturned Additional Member Contributions and unreturned Class B Member Initial Contributions together with simple interest of 8% per annum until all unreturned Additional Member Contributions and the Class B Member Initial Contributions are returned in full, <u>third</u>, until the holders of Class A Membership Interests have received an amount equal to the Waterfall Increase Amount, (a) 90% to the holders of Class A Membership Interests on a pro rata basis; <u>provided</u> that the pro rata distributions of the Class A members shall be adjusted so that the makers of Supplemental Capital Contributions receive an additional 12% annual return at the expense of the Class A members whose failure to make Additional Member Contributions necessitated the making of Supplemental Capital Contributions, and (b) 10% to the Parent, and, <u>fourth</u>, 70% to the holders of Class A Membership Interests on a pro rata basis and 30% to the Parent.

LOS ANGELES 885312 v2

3.   **Management**.  On and after the Effective Date, the Debtor shall be managed as provided in the New Operating Agreement.  Further, without limiting the generality of the foregoing, the Manager shall be entitled to receive the Management Fee and all other compensation and reimbursements described in the New Operating Agreement.  The entry of the Confirmation Order shall ratify and approve all actions taken by the Debtor prior to the date thereof.

The Manager will be an affiliate of Clayton, the servicer of the Note.  Clayton is not an insider of the Debtor, the Parent or the Developer and the Debtor believes that, as Manager, Clayton will have every incentive to act in best interests of the Lenders.  Importantly, the New Operating Agreement requires the Parent and the Developer to aid the Manager in formulating budgets and maintaining Property entitlements.  The expertise of the Parent and Developer in real estate development matters should permit the Debtor to be managed in a reasonable manner post-Effective Date and, in the Debtor's view, is of considerable value to the Lenders.  Further, the Steering Committee, which will be controlled by Lender representatives, will have ultimate say over the approval of budgets and the business plan.  Finally the Management Fee, which will be assessed annually in the amount of 0.5% of the original principal amount of the Note, was negotiated at arms' length and, in the Debtor's view, is reasonable under the circumstances.

4.   **Release of Deed of Trust.**  On the Effective Date, all Liens granted under the Deed of Trust shall be deemed extinguished and satisfied as of the Effective Date without further order of the Bankruptcy Court.  Recordation of the Confirmation Order (or a supplemental order implementing the Plan by evidencing the release of the Deed of Trust) shall be deemed to constitute a full reconveyance of the Deed of Trust without further order of Bankruptcy Court.  Without limiting the generality of the foregoing, the entry of the Confirmation Order shall constitute a direction for Clayton, in its capacity as servicer for the Lenders, to deliver the Deed of Trust, along with any reconveyances reasonably requested by the Debtor, to the Debtor to evidence the automatic cancellation and satisfaction of the Deed of Trust as of the Effective Date.

5.   **Certain Tax Provisions.**  Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of an instrument of transfer as part of a transaction authorized by the

Plan, including, without limitation, any transfers of Property shall not be taxed under any law imposing a stamp tax or similar tax.

6. **Issuance of New Membership Units.** Pursuant to section 1145(a) of the Bankruptcy Code, section 5 of the Securities Act of 1933 and any state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security shall not apply to the issuance of the Class A Membership Interests and the Class B Membership Interests. *Notwithstanding the foregoing, the Class A Membership Interests and Class B Membership Interests, once issued, shall not be publically traded and may only be transferred on the terms and conditions set forth in the New Operating Agreement.* In addition, pursuant to section 1125(e) of the Bankruptcy Code, any Persons that solicit the acceptance or rejection of the Plan, including, the Parent, the Debtor and the Manager, in good faith and in compliance with the Bankruptcy Code, or that participate, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale or purchase of a security, offered or sold under the Plan, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities.

7. **Post-confirmation matters.**

On and after the Effective Date, without need for further action by the members or managers of the Debtor, and without further order of the Bankruptcy Court, the Debtor shall be appointed estate representative under section 1123 of the Bankruptcy Code and shall be solely responsible for and shall have authority to: (a) make all Distributions required to be made on or after the Effective Date to the holders of Allowed Claims, including Distributions of Class A Membership Interests and Class B Membership Interests; (b) settle, resolve and object to Claims, including Note Claims; (c) retain, employ and utilize such Professionals as may be necessary without further approval of the Bankruptcy Court; and (d) do all things necessary and appropriate to fulfill the duties and obligations of the Debtor under the Plan, the Confirmation Order, the Bankruptcy Code and the Bankruptcy Rules. The Debtor, in its capacity as estate representative, shall comply with all withholding and

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

reporting requirements imposed upon it by any Governmental Unit under applicable law and all Distributions shall be subject to such withholding and reporting requirements, if any.

On and after the Effective Date, and without further order of the Bankruptcy Court, the Parent shall be appointed estate representative under section 1123 of the Bankruptcy Code and shall be solely responsible for and shall have authority to: (a) pay all fees payable under 28 U.S.C. § 1930; (b) file any post-Confirmation reports required by the Bankruptcy Code or the Bankruptcy Court and (c) move for the entry of a Final Decree and prepare and file any pleadings as may be required by the Bankruptcy Court in connection with the Final Decree and the closing of the Chapter 11 Case.

8. **Release of Claims by Releasing Lenders**. On the Effective Date, each of the Lenders voting in favor of the Plan (each a "Releasing Lender") and Clayton, on behalf of itself and each of its agents, successors, assigns and representatives of any kind (collectively, the "Releasing Lender Parties"), shall and hereby does voluntarily forever release and discharge the Debtor, any other obligors under the Note, the Guarantor, any obligors under any other guarantees of the Note (if any) and each of such Person's respective agents, successors, assigns and representatives of any kind (collectively, the "Debtor Parties") from any and all claims, demands, causes of action and rights of every kind, nature or character arising or existing on or before the Effective Date arising out of or in any way related to the Note, the Guarantee, any other guarantees of the Note or the Property; whether absolute, inchoate or contingent; whether determined or undetermined, known or unknown, proven or unproven; whether held individually, jointly, or jointly and severally; whether arising directly, indirectly, derivatively, or by way of any legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets or otherwise; whether for compensation, relief, protection, punishment or any other remedy or result of any kind, character or nature; whether based upon any intentional or negligent conduct, strict liability, any tort of any kind, upon any breach of any contract or upon any other grounds or upon any other theory whatsoever; whether asserted or subject to assertion by complaint, cross-complaint, counterclaim, affirmative defense, or other pleading, by motion, by notice or otherwise; whether asserted or subject to assertion in any jurisdiction, in any court or other forum or with any federal, state, county, municipal or other governmental authority, agency or official; and whether arising at law, in equity or otherwise.

Lenders that do not vote, or vote against the Plan shall not be considered Releasing Lenders under the Plan; however, the Debtor and the Guarantors reserve all of their rights under the Nevada Statute.

**9.     Release of Claims by Debtor Parties**.  On the Effective Date, each Debtor Party hereby forever releases and discharges each Releasing Lender Party from any and all claims, demands, causes of action and rights of every kind, nature or character arising or existing on or before the Effective Date arising out of or in any way related to the Note, the Guarantee, any other guarantees of the Note (if any) or the Property; whether absolute, inchoate or contingent; whether determined or undetermined, known or unknown, proven or unproven; whether held individually, jointly, or jointly and severally; whether arising directly, indirectly, derivatively, or by way of any legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets or otherwise; whether for compensation, relief, protection, punishment or any other remedy or result of any kind, character or nature; whether based upon any intentional or negligent conduct, strict liability, any tort of any kind, upon any breach of any contract or upon any other grounds or upon any other theory whatsoever; whether asserted or subject to assertion by complaint, cross-complaint, counterclaim, affirmative defense, or other pleading, by motion, by notice or otherwise; whether asserted or subject to assertion in any jurisdiction, in any court or other forum or with any federal, state, county, municipal or other governmental authority, agency or official; and whether arising at law, in equity or otherwise.

**10.     Corporate Authority.**  The entry of the Confirmation Order shall constitute authorization for the Debtor to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and consummate, the Plan, and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule, or regulation, including, without limitation, any action required by holders of Old Membership Units, including, among other things, the issuance of Class A Membership Interests and Class B Membership Interests, and the adoption of the New Operating Agreement under the Plan.

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

**11.    Avoidance Actions**.  The Debtor does not believe that the estate has any viable avoidance actions and, therefore, does not intend to pursue any such actions after the Effective Date.

## VIII.   CONDITIONS PRECEDENT

**A.    Condition to Confirmation**

It is a condition precedent to Confirmation that the Bankruptcy Court enter a Confirmation Order in form and substance reasonably acceptable to the Debtor and Clayton, which shall include a provision that the Real Property shall be held by the Debtor on the Effective Date free and clear of Liens and Claims as provided for in the Plan.

**B.    Conditions to Effectiveness**

The following are conditions precedent to the occurrence of the Effective Date:

(a)    the Confirmation Date shall have occurred;

(b)    the Confirmation Order shall have been entered and shall be a Final Order;

(c)    each of the "Company Conditions" set forth in the New Operating Agreement shall have been satisfied.  Such Company Conditions include, without limitation, a requirement that the Parent pay the Class B Member Upfront Fee to the Debtor prior to the Effective Date;

(d)    no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, remain pending;

(e)    the Debtor shall have received all approvals necessary or appropriate to substantially consummate the Plan; and

(f)    each and every Plan Document shall be fully executed and in form and substance reasonably satisfactory to the Debtor and Clayton.

**C.    Waiver of Conditions**

Conditions to Confirmation and the occurrence of the Effective Date may be waived, in whole or in part, by the Debtor at any time with the consent of Clayton or an order of the Bankruptcy Code.

### D.    Failure of Conditions

If the Effective Date shall not occur, the Debtor and all other parties in interest shall retain all their rights and remedies as if the Plan had not been proposed. Among other things, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver of any Claims against or equity interests in the Debtor or (b) prejudice in any manner the rights of the Debtor or the Lenders.

## IX.    DISPUTED CLAIMS

### A.    Objection Deadline

Any objections to Administrative Claims and all other Claims made after the Effective Date shall be filed and served on the holders of such Administrative Claims and Claims not later than sixty (60) days after the Effective Date or such later date as may be approved by the Bankruptcy Court via ex parte request.

### B.    Prosecution of Disputed Claims

The Debtor, as estate representative, may object to the allowance of Claims and Administrative Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with the Plan.

### C.    Entitlement to Plan Distributions upon Allowance

Notwithstanding any other provision of the Plan, no Distribution shall be made with respect to any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when), the holder of such Allowed Claim shall thereupon become entitled to receive Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

## X.    EFFECT OF CONFIRMATION

### A.    Revesting of Assets

Subject to the provisions of the Plan and the Confirmation Order, the property of the Estate, including, without limitation, the Property, shall vest in the Debtor on the Effective Date. As of the

Effective Date, all such property, including, without limitation, the Property, shall be free and clear of all Claims, Liens and equity interests, including, without limitation, any claims arising from the Note, any Liens arising from the Deed of Trust and the Old Membership Units to the fullest extent permitted by section 1141(c) of the Bankruptcy Code.  From and after the Effective Date, the Debtor shall be free of any restriction imposed by the Bankruptcy Court, the Bankruptcy Code and the Bankruptcy Rules, other than the obligations set forth in the Plan, or the Confirmation Order.

**B.      Discharge**

Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and equity interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims.  Except as provided in the Plan or the Confirmation Order, Confirmation discharges the Debtor and the reorganized Debtor from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim based on such debt has accepted the Plan.

## XI.      JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and as more particularly set forth in the Plan, the Bankruptcy Court shall retain and have all authority and jurisdiction as is allowed under the Bankruptcy Code and other applicable law to enforce the provisions, purposes, and intent of the Plan; provided, that nothing in the Plan or the Confirmation Order shall provide the Bankruptcy Court with any jurisdiction to determine the rights of the Debtor, the Guarantor or any of the Lenders under or in connection with the Nevada Statute.

## XII.      AMENDMENT AND WITHDRAWAL OF PLAN

**A.      Amendment of the Plan**

At any time before the Confirmation Date, the Debtor may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code; provided that the Debtor may not materially modify the treatment of any Class that has accepted the Plan without the consent of such Class.  After the

Confirmation Date and before substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission in, or reconcile any inconsistencies in the Plan or the Confirmation Order, and to implement such action as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan; provided, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

**B.    Revocation or Withdrawal of the Plan**

The Debtor reserves the right to revoke or withdraw the Plan at any time and for any reason before the Confirmation Date. Without limiting the generality of the foregoing, the Debtor may withdraw the Plan in the event that any Class does not accept the Plan or if there is substantial opposition to the Plan from any Lender notwithstanding such acceptance. If the Plan is withdrawn or revoked, then the Plan shall be deemed null and void, and nothing contained in the Plan or any Plan Documents shall be deemed a waiver of any Claims by or against the Debtor or any other Person in any further proceedings involving the Debtor.

## XIII.    TAX CONSEQUENCES OF THE PLAN

**THE PLAN MAY HAVE SIGNIFICANT TAX CONSEQUENCES FOR ALL CREDITORS AND EQUITY HOLDERS OF THE DEBTOR. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**THE DEBTOR AND THE REORGANIZED DEBTOR MAY WITHHOLD ALL AMOUNTS REQUIRED BY LAW TO BE WITHHELD FROM PAYMENTS TO HOLDERS OF ALLOWED CLAIMS.**

## XIV.    RISK FACTORS

The restructuring of the Debtor contemplated by the Plan involves a degree of risk, and this Disclosure Statement contains forward-looking statements that involve risks and uncertainty. The

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION DATED DECEMBER 1, 2010

Debtor's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **Holders of Claims and equity interests should consider carefully the following factors, in addition to the other information contained in this Disclosure Statement, before submitting a vote to accept or reject the Plan. The below risk factors should not be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

The Plan contains several material risks, including, without limitation:

- Under the Plan, the Parent has agreed to fund property tax payments in respect of the Property through December 31, 2011. All other carry costs of the Property must be voluntarily borne by the Lenders receiving Class A Membership Interests in the Debtor. If the Lenders are unwilling to contribute sufficient capital to pay such costs, the Debtor, the Manager and the Developer may not be able to effectively market and sell the Property or maintain entitlements. Further, if property taxes accruing after December 31, 2011 are not funded by the Lenders through additional capital contributions, the Property may be lost to foreclosure.

- Major Decisions of the Debtor can be authorized by a vote of 65% of the Class A Membership Interests, including, without limitation, the incurrence of additional indebtedness and the sale of the Property. As a result, the Debtor may make Major Decisions over the objection of an individual Lender.

- Under the New Operating Agreement, the Debtor will be managed by an affiliate of Clayton. Although the Manager must seek approval of all budgets and business plans from the Steering Committee, the Manager otherwise will have wide latitude in managing the Debtor notwithstanding the preferences of the Lenders.

- The New Operating Agreement permits the Steering Committee to authorize the sale of Property without the consent of the holders of Class A Membership Interests if (A) the sale will produce sufficient net proceeds to return all Additional Member Contributions and Supplemental Capital Contributions along with the required return

thereon and (B) such sale is for market value as determined by an MAI authorized appraiser. Accordingly, the Property may be sold under those circumstances without the direct consent of the Lenders and over the objection of any individual Lender.

- If the Lenders holding Class A Membership Interests are unwilling to fund the carry costs of the Property, the Debtor may, subject to the terms of the New Operating Agreement, seek financing to pay such costs and may secure such financing with the Property. Thereafter, the lender providing such financing may foreclose upon the Property if the Debtor is unable to meet its debt obligations to such lender.

- There is no guarantee that liquidity in the real estate market in southern Nevada will improve in the future. As a result, the Property may lose value after the Effective Date, impairing the value of the Class A Membership Interests issued to the Lenders under the Plan.

- Although the Developer believes that it can weather the downturn in the real estate market, such an outcome is not guaranteed. If the Developer fails, it will not be able to effectively market the Property and the Property could lose value.

- Under the Plan, the Parent and the Developer are prepared to pay the cost of the plan process only so long as such cost is reasonable. If there are lengthy objections to the Plan, such parties may refuse to continue to fund the Debtor. In such a case, the Plan will likely be withdrawn and the Debtor's bankruptcy case may be converted to chapter 7. In such event, the Plan will not be confirmed and the Lenders will lose the benefit of the Plan.

## XV.    LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that a holder of a Claim in an impaired Class receive or retain under the Plan not less than the holder would receive or retain on account of the Claim if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. This test is often referred to as the "best interest of creditors" test.

To apply the "best interests" test, the Bankruptcy Court must first calculate the aggregate dollar amount that would be generated from a liquidation of the Debtor's assets in a hypothetical

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

liquidation on the Effective Date under Chapter 7, including the amount of cash and other tangible assets held by such Debtor and the value of any projected recoveries on actions against third parties and other intangible assets held by such Debtor (the "Liquidation Value"). The Liquidation Value must then be reduced by the costs of liquidation, including administrative costs of the Chapter 7 estates and compensation to the Chapter 7 trustees and other professionals retained by the trustees (the "Liquidation Costs"). After estimating the Liquidation Value and the Liquidation Costs, the Bankruptcy Court must ascertain the potential Chapter 7 recoveries by Creditors and then compare those recoveries with the distributions offered under the Plan to determine if the Plan is in the "best interests" of Creditors in each Class. Attached hereto as Exhibit B is a spreadsheet (the "Spreadsheet") setting forth the Liquidation Value, the Liquidation Costs and the expected return to unsecured creditors in a Chapter 7 case.

The Debtor retained Valemount Capital ("Valemount") to provide a valuation of the Property. Valemount and its employees have extensive experience in the Las Vegas real estate market and have estimated that the rapid liquidation of the Property in a chapter 7 would generate values equal to between $53,000 and $79,500. Valemount has also estimated that the price of the Property, if properly marketed and held over the next five to seven years, would be between $1,696,000 and $2,544,000, a considerable increase in value. The Spreadsheet attached hereto adopts these values to produce the liquidation analysis set forth therein.

## XVI.  ACCEPTANCE AND CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code relevant to acceptance and confirmation of a plan of reorganization. Holders of Claims and equity interests are encouraged to review the relevant provisions of the Bankruptcy Code with their own attorneys.

### A.  Acceptance of the Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a Class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims of that Class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a Class of

interests as acceptance by at least two-thirds in amount of the allowed interests of that Class that have actually voted or are deemed to have voted to accept or reject a plan.

The Debtor will not go forward with the Plan unless each Class of creditors accepts the Plan.

**B.    Confirmation**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing regarding the Plan has been provided to all known holders of Claims and equity interests or their respective representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of Claims or equity interests held or asserted by that party against the Debtor's Estate or property, and the specific basis for the objection. Such objection must be filed with the Bankruptcy Court, together with a proof of service, and served on all parties and by the date set forth on the notice of the Confirmation Hearing.

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If the Bankruptcy Court so determines, the Bankruptcy Court will enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

- The Plan must comply with the applicable provisions of the Bankruptcy Code;

- The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

- The Plan must have been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised to be made by the Debtor under the Plan for professional services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan, must have been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan must be reasonable, or if such payment is to be fixed after Confirmation of the

Plan, such payment must be subject to the approval of the Bankruptcy Court as reasonable;

- The Debtor must have disclosed the identity and affiliates of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, must be consistent with the interests of holders of Claims and equity interests and with public policy, and the Debtor must have disclosed the identity of any insider that the reorganized Debtor will employ or retain, and the nature of any compensation for such insider;

- With respect to each Class of impaired Claims or equity interests, either each holder of a Claim or equity interest of such Class must have accepted the Plan, or must receive or retain under the Plan on account of such Claim or equity interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code;

- Each Class of Claims or equity interests must have either accepted the Plan or not be impaired under the Plan;

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims will be paid in full on the Effective Date;

- If a Class of Creditors is impaired under the Plan, at least one impaired Class of Claim must have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class; and

- Confirmation of the Plan must not be followed by the liquidation, or the need for further financial reorganization of the Debtor or any other successor.

## XVII. MISCELLANEOUS PROVISIONS

### A.    Filing Objections to Claims

From and after the Effective Date, the Debtor, in its capacity as estate representative, may litigate to Final Order, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

### B.    Holding of, and Failure to Claim, Undeliverable Distributions

All Distributions other than Distributions to the Lenders are to be made to the holder of each Allowed Claim by the Debtor as estate representative at the address of such holder listed on the Schedules or proof of claim filed by such holder at the time of such Distribution.  Distributions to the Lenders are to be made by tendering such Distributions to the Manager for the benefit of the Lenders.  If any holder's Distribution is returned as undeliverable, no further Distributions to such

holder shall be made unless and until the Debtor is notified of such holder's then current address, at which time all required Distributions shall be made to such holder.  Undeliverable Distributions shall be held by the Debtor until such Distributions are claimed.  All Claims for undeliverable Distributions must be made within ninety (90) days following a Distribution.  After such date, all unclaimed Distributions shall be allocated pro rata to the members of the Class related to such Distribution notwithstanding any federal or state escheat laws to the contrary.

### C.    Fractional Amounts

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

### D.    Ex Parte Relief

Upon *ex parte* motion by the Debtor after the Confirmation Date, the Bankruptcy Court may enter such order and further orders as may be necessary or appropriate to instruct and direct the Debtor and others, and to facilitate the Distributions contemplated in the Plan.

### E.    Binding Effect

The Plan shall be binding on, and shall inure to the benefit of, the Debtor and the holders of all Claims and equity interests and their respective successors and assigns.

### F.    Exculpation

The Debtor, the Parent, the Manager, Clayton and its affiliates and each member of the Steering Committee and their respective officers, directors, agents, managers, shareholders or attorneys shall not be liable for any actions or omissions taken or not taken in connection with or arising out of the administration of the Chapter 11 Case, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

### G.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations of the Debtor, all Creditors and any other Person arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Nevada, without giving effect to Nevada's choice of law provisions.

### H.    Modification of Payment Terms

At any time after the Effective Date, the Debtor may modify the treatment of any Allowed Claim or equity interest in any manner adverse to the holder of such Claim or equity interest only with the prior written consent of the holder whose Allowed Claim or equity interest treatment is being adversely affected.

### I.    United States Trustee Fees

The Parent shall pay all quarterly fees payable to the Office of the United States Trustee after Confirmation in connection with the Chapter 11 Case, consistent with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and 28 U.S.C. § 1930(a)(6).

### J.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in the Bankruptcy Court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

### K.    Final Decree

After the Estate is fully administered, the Parent shall file an application for a Final Decree, and shall serve the application on the U.S. Trustee, together with a proposed Final Decree.

*[remainder of page intentionally left blank]*

## XVIII. RECOMMENDATION AND CONCLUSION

The Debtor has analyzed different scenarios and believes that the Plan will provide for a larger distribution to holders of Claims than would otherwise result if an alternative restructuring plan were proposed or if the Debtor was liquidated under Chapter 7.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller distributions to the holders of Claims and equity interests. Accordingly, the Debtor recommends confirmation of the Plan and urges all holders of Allowed Claims to vote to accept the Plan and to indicate acceptance by returning their Ballots so as to be received by no later than the voting deadline.

Dated: December 1, 2010                    Respectfully submitted,

                                C-SWDE382, LLC, a Nevada limited liability company
                                By:   LEHM, LLC, its Manager

                                By:   _____
                                          John A. Ritter, its Manager

LOSANGELES 885312 v2

DISCLOSURE STATEMENT FOR DEBTOR'S PLAN
OF REORGANIZATION DATED DECEMBER 1, 2010

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**
**To Disclosure Statement**

**PLAN OF REORGANIZATION DATED DECEMBER 1, 2010**

LOS ANGELES 885312 v2

I. Scott Bogatz
Nevada Bar No. 3367
BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, NV 89129
Telephone: (702) 776-7000
Facsimile: (702) 776-7800
Email: sbogatz@isbnv.com

Counsel for Debtor and Debtor-in-Possession,
C-SWDE382, LLC

Roberto J. Kampfner
California State Bar No. 179026
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: rkampfner@whitecase.com

Counsel for Southwest Desert Equities,
LLC, the parent of the Debtor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. [To Be Determined] |
| C-SWDE382, LLC, a Nevada limited liability company, | Chapter 11 |
| Debtor and Debtor-in-Possession. | **DEBTOR'S PLAN OF REORGANIZATION DATED DECEMBER 1, 2010** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEBTOR'S PLAN OF REORGANIZATION DATED
DECEMBER 1, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE 1.    DEFINITIONS AND RULES OF INTERPRETATION .......................................1

1.1.    Additional Member Contributions...............................................................1
1.2.    Administrative Claim ....................................................................................1
1.3.    Administrative Claim Bar Date ....................................................................2
1.4.    Allowed ........................................................................................................2
1.5.    Bankruptcy Code ..........................................................................................2
1.6.    Bankruptcy Court .........................................................................................2
1.7.    Bankruptcy Rules .........................................................................................2
1.8.    Bar Date .......................................................................................................2
1.9.    Business Day ................................................................................................2
1.10.    Cash .............................................................................................................2
1.11.    Chapter 11 Case ...........................................................................................3
1.12.    Claim ...........................................................................................................3
1.13.    Class .............................................................................................................3
1.14.    Class A Members Initial Contribution.........................................................3
1.15.    Class A Membership Interests .....................................................................3
1.16.    Class B Membership Interests .....................................................................3
1.17.    Class B Member Initial Contribution ..........................................................3
1.18.    Class B Member Upfront Payment ..............................................................3
1.19.    Clayton.........................................................................................................3
1.20.    Confirmation ...............................................................................................3
1.21.    Confirmation Date .......................................................................................3
1.22.    Confirmation Hearing ..................................................................................4
1.23.    Confirmation Order ......................................................................................4
1.24.    Creditor ........................................................................................................4
1.25.    Debtor ..........................................................................................................4
1.26.    Debtor Parties ..............................................................................................4
1.27.    Deed of Trust ...............................................................................................4
1.28.    Disputed .......................................................................................................4
1.29.    Distribution ..................................................................................................4
1.30.    Effective Date ..............................................................................................4
1.31.    Estate ...........................................................................................................4
1.32.    Final Decree .................................................................................................4
1.33.    Final Order ...................................................................................................5
1.34.    Governmental Unit .......................................................................................5
1.35.    Governmental Unit Claims Bar Date............................................................5
1.36.    Guarantee .....................................................................................................5
1.37.    Guarantor .....................................................................................................5
1.38.    Lender ..........................................................................................................5
1.39.    Lien ..............................................................................................................5
1.40.    Local Rules ..................................................................................................5
1.41.    Manager .......................................................................................................6
1.42.    Management Fee ...........................................................................................6
1.43.    New Operating Agreement ...........................................................................6

1.44.    Note ............................................................................................. 6
1.45.    Note Claims .................................................................................. 6
1.46.    Old Membership Units .................................................................. 6
1.47.    Parent ........................................................................................... 6
1.48.    Person .......................................................................................... 6
1.49.    Petition Date ................................................................................ 6
1.50.    Plan .............................................................................................. 6
1.51.    Plan Documents ........................................................................... 6
1.52.    Professionals ................................................................................ 7
1.53.    Professional Fees ......................................................................... 7
1.54.    Property ........................................................................................ 7
1.55.    Property Tax Claims ..................................................................... 7
1.56.    Pro Rata Share ............................................................................. 7
1.57.    Releasing Lenders ........................................................................ 7
1.58.    Releasing Lender Parties .............................................................. 7
1.59.    Schedules ..................................................................................... 7
1.60.    Steering Committee ...................................................................... 7
1.61.    Supplemental Capital Contribution .............................................. 7
1.62.    Waterfall Increase Amount ........................................................... 7

ARTICLE 2.    TREATMENT OF UNCLASSIFIED CLAIMS ............................ 8
2.1.    Unclassified Claims ...................................................................... 8
2.2.    Administrative Claims. .................................................................. 8
2.3.    Claims for Professional Fees ........................................................ 8
2.4.    Post-Effective Date Professional Fees .......................................... 9

ARTICLE 3.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ....... 9

ARTICLE 4.    TREATMENT OF CLAIMS AND EQUITY INTERESTS ............. 9
4.1.    Class 1 – Property Tax Claims. ..................................................... 9
4.2.    Class 2 – Note Claims. .................................................................. 9
4.3.    Class 3 – Old Membership Units. ............................................... 10

ARTICLE 5.    IMPLEMENTATION OF THE PLAN ...................................... 10
5.1.    Issuance of Class A Membership Interests .................................. 10
5.2.    Adoption of Operating Agreement .............................................. 10
5.3.    Management ................................................................................ 11
5.4.    Release of Deed of Trust ............................................................ 11
5.5.    Certain Tax Provisions ................................................................ 12
5.6.    Issuance of New Membership Units ........................................... 12
5.7.    Post-confirmation matters ........................................................... 12
5.8.    Release of Claims by Releasing Lenders .................................... 13
5.9.    Release of Claims by Debtor Parties .......................................... 14
5.10.    Corporate Authority .................................................................... 14

ARTICLE 6.    CONDITIONS PRECEDENT .................................................. 15
6.1.    Condition to Confirmation .......................................................... 15
6.2.    Conditions to Effectiveness ........................................................ 15
6.3.    Waiver of Conditions .................................................................. 15
6.4.    Failure of Conditions .................................................................. 15

ARTICLE 7.      [RESERVED] ................................................................................................. 16

ARTICLE 8.      DISPUTED CLAIMS ..................................................................................... 16
    8.1.      Objection Deadlines .................................................................................... 16
    8.2.      Prosecution of Disputed Claims ................................................................ 16
    8.3.      Entitlement to Plan Distributions upon Allowance ................................... 16

ARTICLE 9.      EFFECT OF CONFIRMATION ....................................................................... 16
    9.1.      Revesting of Assets .................................................................................... 16
    9.2.      Discharge .................................................................................................... 17

ARTICLE 10.     RETENTION OF JURISDICTION ................................................................. 17

ARTICLE 11.     AMENDMENT AND WITHDRAWAL OF PLAN ...................................... 19
    11.1.     Amendment of the Plan .............................................................................. 19
    11.2.     Revocation or Withdrawal of the Plan ...................................................... 20

ARTICLE 12.     ACCEPTANCE OR REJECTION OF THE PLAN ....................................... 20
    12.1.     Impaired Classes to Vote ........................................................................... 20
    12.2.     Acceptance by Class of Creditors ............................................................. 20

ARTICLE 13.     MISCELLANEOUS ....................................................................................... 20
    13.1.     Settlement of Objections after Effective Date .......................................... 20
    13.2.     Holding of, and Failure to Claim, Undeliverable Distributions ............... 20
    13.3.     Fractional Amounts .................................................................................... 21
    13.4.     Ex Parte Relief ........................................................................................... 21
    13.5.     Exculpation ................................................................................................ 21
    13.6.     Binding Effect ............................................................................................ 21
    13.7.     Governing Law ........................................................................................... 21
    13.8.     Modification of Payment Terms ................................................................ 22
    13.9.     United States Trustee Fees ......................................................................... 22
    13.10.    Computation of Time .................................................................................. 22
    13.11.    Final Decree ............................................................................................... 22
    13.12.    No Admissions ........................................................................................... 22

## PLAN OF REORGANIZATION

C-SWDE382, LLC, a Nevada limited liability company (the "Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 Case, hereby proposes the following plan of reorganization (the "Plan") for the resolution of the Debtor's outstanding Claims and equity interests.

*All holders of Claims against, and equity interests in, the Debtor are encouraged to read the Plan and the related solicitation materials in their entirety before voting to accept or reject the Plan.*

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in Section 11.1 of the Plan, the Debtor expressly reserves the right to alter, amend, or modify the Plan one or more times before its substantial consummation.

## ARTICLE 1. DEFINITIONS AND RULES OF INTERPRETATION

For purposes of the Plan, all capitalized terms shall have the meanings ascribed to them in this Article 1 of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, retains the meaning specified for such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. Whenever the context requires, such terms include the plural as well as the singular, the masculine gender includes the feminine gender, and the feminine gender includes the masculine gender.

As used in the Plan, the following terms have the meanings specified below:

**1.1. Additional Member Contributions**. Has the meaning set forth in the New Operating Agreement.

**1.2. Administrative Claim**. A Claim for any cost or expense of administration of the Chapter 11 Case allowed under sections 503(b) or 507(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's businesses; (c) actual and necessary costs and expenses of preserving

the Estate or administering the Chapter 11 Case; and (d) all Professional Fees to the extent Allowed by Final Order under sections 330, 331, or 503 of the Bankruptcy Code.

**1.3. Administrative Claim Bar Date**. The date that is thirty (30) days after the Effective Date.

**1.4. Allowed**. With reference to any Claim against or equity interest in the Debtor, (a) any Claim which has been listed by the Debtor in the Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim or objection to Claim has been filed, (b) any Claim or equity interest allowed hereunder, (c) any Claim, proof of which was filed on or before the Bar Date, or, with respect to a Governmental Unit, before the Governmental Unit Claims Bar Date, or equity interest, which is not Disputed, (d) any Claim or equity interest that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court, or (e) any Claim or equity interest which, if Disputed, has been allowed by Final Order.

**1.5. Bankruptcy Code**. Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time and as applicable to the Chapter 11 Case.

**1.6. Bankruptcy Court**. The United States Bankruptcy Court for the District of Nevada that will have jurisdiction over the Chapter 11 Case.

**1.7. Bankruptcy Rules**. Collectively, the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075 and any Local Rules, as applicable to the Chapter 11 Case.

**1.8. Bar Date**. The date established by order of the Bankruptcy Court as the last day for the filing of proofs of claim against the Debtor; provided, that the deadline for filing proofs of claim by a Governmental Unit shall be the Governmental Unit Claims Bar Date.

**1.9. Business Day**. Any day other than a Saturday, Sunday, or legal holiday, as defined in Bankruptcy Rule 9006(a).

**1.10. Cash**. Currency, certified checks, official checks, money orders, negotiable instruments, and wire transfers of immediately available funds.

**1.11. Chapter 11 Case**. The case under Chapter 11 of the Bankruptcy Code in which the Debtor is a debtor and debtor-in-possession, pending before the Bankruptcy Court.

**1.12. Claim**. A claim, as defined in section 101(5) of the Bankruptcy Code, against a Person or its property, including, without limitation: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured arising at any time before the Effective Date; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.13. Class**. A category of holders of Claims or equity interests that are substantially similar in nature to the Claims or equity interests of other holders placed in such category, as designated in Article 3 of the Plan.

**1.14. Class A Members Initial Contribution**. An amount equal to the original principal amount of the Note.

**1.15. Class A Membership Interests**. The membership interests in the reorganized Debtor to be issued to the Lenders pursuant to the Plan.

**1.16. Class B Membership Interests**. The membership interests in the reorganized Debtor to be issued to the Parent pursuant to the Plan.

**1.17. Class B Member Initial Contribution**. Has the meaning set forth in the New Operating Agreement.

**1.18. Class B Member Upfront Payment**. Has the meaning set forth in the New Operating Agreement.

**1.19. Clayton**. L.S.T. Investments, LLC, a Nevada limited liability company doing business as Clayton Mortgage & Investment.

**1.20. Confirmation**. The entry of the Confirmation Order by the Bankruptcy Court.

**1.21. Confirmation Date**. The date on which the Bankruptcy Court enters the Confirmation Order.

**1.22. Confirmation Hearing.** The hearing held by the Bankruptcy Court to consider Confirmation of the Plan.

**1.23. Confirmation Order.** The order of the Bankruptcy Court confirming the Plan in accordance with the Bankruptcy Code.

**1.24. Creditor.** Has the meaning set forth in section 101(10) of the Bankruptcy Code.

**1.25. Debtor.** Has the meaning set forth in the preamble to the Plan.

**1.26. Debtor Parties.** Has the meaning set forth in Section 5.8 of the Plan.

**1.27. Deed of Trust.** That certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of October 12, 2006 securing the Note and recorded in the official records of Clark County, Nevada as Instrument No. 20061103-0003908.

**1.28. Disputed.** With respect to Claims, any Claim: (a) that is listed in the Schedules as unliquidated, disputed, or contingent and as to which no proof of claim has been filed; or (b) as to which the Debtor or any other proper party-in-interest has interposed a timely objection or request for estimation, or has sought to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by the Debtor in accordance with applicable law and as to which such objection, request for estimation, or request for subordination has not been withdrawn or determined by a Final Order.

**1.29. Distribution.** A payment of Cash to the holder of an Allowed Claim pursuant to the Plan.

**1.30. Effective Date.** The later of: (a) the first Business Day that is at least fourteen (14) days after the Confirmation Date and on which no stay of the Confirmation Order is in effect; and (b) the Business Day on which all of the conditions set forth in Section 6.2 of the Plan have been satisfied or waived.

**1.31. Estate.** The estate created in the Debtor's Chapter 11 Case in accordance with section 541 of the Bankruptcy Code.

**1.32. Final Decree.** A final decree closing this Chapter 11 Case.

-4-

**1.33.  Final Order.**  An order or judgment of the Bankruptcy Court:  (a) as to which the time to appeal, petition for certiorari, move for retrial, or seek other review or reconsideration has expired and as to which no appeal, petition for certiorari, motion for retrial or other proceeding for review or reconsideration is pending; (b) as to which any right to appeal, to petition for certiorari, to move for retrial, or to seek other review or reconsideration has been waived in writing in form and substance satisfactory to the Debtor; or (c) as to which, if an appeal, writ of certiorari, retrial or other review or reconsideration has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed or from which such relief was sought or such court has denied such appeal or such relief and the time to take any further appeal, petition for certiorari, move for retrial or seek other review or reconsideration has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order does not prevent such order from being a Final Order.

**1.34.  Governmental Unit.**  Has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.35.  Governmental Unit Claims Bar Date.**  The deadline for filing proofs of claim by a Governmental Unit.

**1.36.  Guarantee.**  The guarantee issued by the Guarantor in favor of the Lenders in connection with the Note.

**1.37.  Guarantor.**  John A. Ritter, an individual and Darrin D. Badger, an individual.

**1.38.  Lender.**  A holder of a beneficial interest in the Note.

**1.39.  Lien.**  A lien as defined in section 101(37) of the Bankruptcy Code, except a lien that has been avoided in accordance with sections 506, 544, 545, 546, 547, 548, 549, or 553 of the Bankruptcy Code.

**1.40.  Local Rules.**  The local rules of the United States Bankruptcy Court for the District of Nevada governing proceedings in this Chapter 11 Case.

**1.41.  Manager**.  The Person designated by Clayton to manage the reorganized Debtor pursuant to the terms of the New Operating Agreement.

**1.42.  Management Fee.**  Collectively, an annual fee payable by the Debtor to the Manger, on a quarterly basis, in an amount equal to .5% of the original principal amount of the Note.

**1.43.  New Operating Agreement**.  The operating agreement to govern the Debtor after the Effective Date substantially in the form attached hereto as Exhibit A.

**1.44.  Note**.  That certain promissory note dated as of October 12, 2006 in the original principal amount of $2,580,000 issued by Parent and assumed by the Debtor prior to the Petition Date and attached hereto as Exhibit B.

**1.45.  Note Claims**.  The Claims of the Lenders under or in connection with the Note, including, without limitation, any Claims in respect of principal, interest and fees.

**1.46.  Old Membership Units**.  The membership units in the Debtor issued prior to the confirmation of the Plan.

**1.47.  Parent.**  Southwest Desert Equities, LLC, a Nevada limited liability company.

**1.48.  Person**.  Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated association or organization, or other "person" as defined in section 101(41) of the Bankruptcy Code as well as any governmental agency, Governmental Unit or associated political subdivision.

**1.49.  Petition Date**.  The date upon the Debtor files a petition for relief under chapter 11 of the Bankruptcy Code.

**1.50.  Plan**.  This plan of reorganization, either in its present form or as it may be amended, supplemented or modified from time to time, including, without limitation, all of its annexed exhibits and schedules and the Plan Documents.

**1.51.  Plan Documents**.  The New Operating Agreement and all other material documents required to implement the provisions of the Plan.

**1.52. Professionals**. Those Persons employed in accordance with an order of the Bankruptcy Court under sections 327 or 1103 of the Bankruptcy Code and to be compensated for services under sections 327, 328, 329, 330, and 331 of the Bankruptcy Code.

**1.53. Professional Fees**. The Administrative Claims for compensation and reimbursement of expenses of Professionals submitted in accordance with sections 330 or 331 of the Bankruptcy Code, or any Administrative Claims Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.54. Property**. All of the Debtor's right, title and interest of any nature in property of any kind as of the Confirmation Date, wherever located, as specified in section 541 of the Bankruptcy Code, including, without limitation, the real property identified by APN No. 126-01-101-011.

**1.55. Property Tax Claims**. Any Claims of a Governmental Unit for property taxes related to the Property, whether such liability is *in rem*, *in personam* or both.

**1.56. Pro Rata Share**. The proportion that an Allowed Claim bears to the aggregate amount of all Claims in a particular class, including, without limitation, Disputed Claims that have not been disallowed by a Final Order.

**1.57. Releasing Lenders**. Has the meaning set forth in Section 5.8.

**1.58. Releasing Lender Parties**. Has the meaning set forth in Section 5.8.

**1.59. Schedules**. The schedules of assets and liabilities, the list of holders of interests, and the statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements may have been or may be supplemented or amended from time to time.

**1.60. Steering Committee.** Has the meaning set forth in the New Operating Agreement.

**1.61. Supplemental Capital Contribution**. Has the meaning set forth in the New Operating Agreement.

**1.62. Waterfall Increase Amount**. An amount equal to the sum of the Class A Members Initial Contribution and an annual assessment equal to 1% of the Class A Members Initial Contribution, prorated monthly, from the Effective Date through the date of the sale of the Property.

## ARTICLE 2. TREATMENT OF UNCLASSIFIED CLAIMS

**2.1. Unclassified Claims**. As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including, without limitation, Claims for Professional Fees are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims instead are treated separately in accordance with this Article 2 and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

**2.2. Administrative Claims**.

 **2.2.1. Generally**. Each Administrative Claim other than a Claim for Professional Fees shall be paid in full in Cash by the Debtor on the later to occur of (a) the Effective Date; (b) the tenth (10th) day after such Administrative Claim is Allowed; and (c) such date as the holder of any such Administrative Claim and the Debtor may agree.

 **2.2.2. Requests for Payment**. All requests for payment of Administrative Claims, other than requests for payment of Claims for Professional Fees, must be filed by the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Debtor.

**2.3. Claims for Professional Fees**. Each Person seeking an award by the Bankruptcy Court of Professional Fees: (a) must file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days of the Effective Date; and (b) if the Bankruptcy Court grants such an award, must be paid in full in Cash by the Debtor with funds contributed by the Parent in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the requirements of the Bankruptcy Code, the Bankruptcy Rules and any applicable guidelines and with all of the terms and conditions set forth in any applicable order of the Bankruptcy Court, including, without limitation, the Confirmation Order, and all other orders governing payment of Professional Fees.

**2.4. Post-Effective Date Professional Fees**. All Professional Fees for services rendered in connection with the Chapter 11 Case and the Plan after the Effective Date may be paid by the Debtor upon receipt of an invoice for such services, or on such other terms to which the Debtor and the relevant Professional may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

## ARTICLE 3. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors (except those Claims receiving treatment as set forth in Article 2) and holders of equity interests, including holders of Old Membership Units are placed in the Classes described below for all purposes, including, without limitation, voting on, Confirmation of, and Distribution under, the Plan:

| Class 1 | Property Tax Claims | Unimpaired, deemed to accept |
|---------|---------------------|------------------------------|
| Class 2 | Note Claims | Impaired, entitled to vote |
| Class 3 | Old Membership Units | Impaired, entitled to vote |

## ARTICLE 4. TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1. Class 1 – Property Tax Claims**.

**4.1.1. Impairment and Voting**. Class 1 consists of Property Tax Claims. Property Tax Claims are unimpaired by the Plan; consequently, the holders of Property Tax Claims are deemed to have accepted the Plan.

**4.1.2. Treatment**. On the Effective Date, each holder of an Allowed Property Tax Claim shall receive a single Cash payment equal to the sum of (a) its Allowed Property Tax Claim and (b) all accrued postpetition interest calculated at the rate required by applicable nonbankruptcy law.

**4.2. Class 2 – Note Claims**.

**4.2.1. Impairment and Voting**. Class 2 consists of the Note Claims. Note Claims are impaired by the Plan; consequently, the holders of Note Claims are entitled to vote on the Plan.

**4.2.2. Treatment**. On the Effective Date, each holder of a Note Claim shall receive, in complete satisfaction of such Claim and any Liens under the Deed of Trust securing such Claim,

its Pro Rata Share of 100% of the Class A Membership Interests as more particularly set forth in the New Operating Agreement. Such Class A Membership Interests shall have all of the rights and obligations set forth in the New Operating Agreement.

### 4.3. Class 3 – Old Membership Units.

**4.3.1. Impairment and Voting.** Class 3 consists of the Old Membership Units. Old Membership Units are impaired by the Plan; consequently, the holders of Old Membership Units are entitled to vote on the Plan.

**4.3.2. Treatment.** On the Effective Date, and upon the payment of the Class B Member Upfront Payment, the Old Membership Units shall be exchanged for the Class B Membership Interests. Such Class B Membership Interests shall have all of the rights and obligations set forth in the New Operating Agreement.

### ARTICLE 5. IMPLEMENTATION OF THE PLAN

**5.1. Issuance of Class A Membership Interests.** On the Effective Date, the Old Membership Units shall be cancelled and the Debtor shall issue, without further order of the Bankruptcy Court or need for corporate approval, the Class A Membership Interests and the Class B Membership Interests as provided for in the Plan and the New Operating Agreement.

**5.2. Adoption of Operating Agreement.** On and after the Effective Date, and without further order of the Bankruptcy Court or need for corporate approval, the Debtor shall be governed by the New Operating Agreement and such agreement shall supersede all other operating agreements in respect of the Debtor. The New Operating Agreement shall provide at all times that distributions from the reorganized Debtor to its members, including the holders of Class A Membership Interests and Class B Membership Interests, shall be paid first to the makers of Supplemental Capital Contributions in an amount equal to all unreturned Supplemental Capital Contributions together with simple interest at a rate of 8% per annum until all such unreturned Supplemental Capital Contributions (together with accrued interest) shall have been returned in full, second, ratably, in proportion to the amount then due, to the makers of Additional Member Contributions and the Parent in the amount of all unreturned Additional Member Contributions and unreturned Class B Member

Initial Contributions together with simple interest of 8% per annum until all unreturned Additional Member Contributions and the Class B Member Initial Contributions are returned in full, third, until the holders of Class A Membership Interests have received an amount equal to the Waterfall Increase Amount, (a) 90% to the holders of Class A Membership Interests on a pro rata basis; provided that the pro rata distributions of the Class A members shall be adjusted so that the makers of Supplemental Capital Contributions (including the Parent in its capacity as the Class B member if any Supplemental Capital Contributions have been made by the Parent in such capacity) receive an additional 12% annual return at the expense of the Class A members whose failure to make Additional Member Contributions necessitated the making of Supplemental Capital Contributions, and (b) 10% to the Parent in its capacity as the Class B member, and, fourth, 70% to the holders of Class A Membership Interests on a pro rata basis and 30% to the Parent in its capacity as the Class B member.

**5.3. Management**. On and after the Effective Date, the Debtor shall be managed as provided in the New Operating Agreement. Further, without limiting the generality of the foregoing, the Manager shall be entitled to receive the Management Fee and all other compensation and reimbursements described in the New Operating Agreement. The entry of the Confirmation Order shall ratify and approve all actions taken by the Debtor prior to the date thereof.

**5.4. Release of Deed of Trust**. On the Effective Date, all Liens granted under the Deed of Trust shall be deemed extinguished and satisfied as of the Effective Date without further order of the Bankruptcy Court. Recordation of the Confirmation Order (or a supplemental order implementing the Plan by evidencing the release of the Deed of Trust) shall be deemed to constitute a full reconveyance of the Deed of Trust without further order of Bankruptcy Court. Without limiting the generality of the foregoing, the entry of the Confirmation Order shall constitute a direction for Clayton, in its capacity as servicer for the Lenders, to deliver the Deed of Trust, along with any reconveyances reasonably requested by the Debtor, to the Debtor to evidence the automatic cancellation and satisfaction of the Deed of Trust as of the Effective Date.

**5.5. Certain Tax Provisions**. Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of an instrument of transfer as part of a transaction authorized by the Plan, including, without limitation, any transfers of Property shall not be taxed under any law imposing a stamp tax or similar tax.

**5.6. Issuance of New Membership Units**. Pursuant to section 1145(a) of the Bankruptcy Code, section 5 of the Securities Act of 1933 and any state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security shall not apply to the issuance of the Class A Membership Interests and the Class B Membership Interests. Notwithstanding the foregoing, the Class A Membership Interests and Class B Membership Interests, once issued, shall not be publicly traded and may only be transferred on the terms and conditions set forth in the New Operating Agreement. In addition, pursuant to section 1125(e) of the Bankruptcy Code, any Persons that solicit the acceptance or rejection of the Plan, including, the Parent, the Debtor and the Manager, in good faith and in compliance with the Bankruptcy Code, or that participate, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale or purchase of a security, offered or sold under the Plan, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities.

**5.7. Post-confirmation matters**.

**5.7.1. Responsibilities of the Reorganized Debtor**. On and after the Effective Date, without need for further action by the members or managers of the Debtor, and without further order of the Bankruptcy Court, the Debtor shall be appointed estate representative under section 1123 of the Bankruptcy Code and shall be solely responsible for and shall have authority to: (a) make all Distributions required to be made on or after the Effective Date to the holders of Allowed Claims, including Distributions of Class A Membership Interests and Class B Membership Interests; (b) settle, resolve and object to Claims, including Note Claims; (c) retain, employ and utilize such Professionals as may be necessary without further approval of the Bankruptcy Court; and (d) do all

things necessary and appropriate to fulfill the duties and obligations of the Debtor under the Plan, the Confirmation Order, the Bankruptcy Code and the Bankruptcy Rules.  The Debtor, in its capacity as estate representative, shall comply with all withholding and reporting requirements imposed upon it by any Governmental Unit under applicable law and all Distributions shall be subject to such withholding and reporting requirements, if any.

       **5.7.2.  Responsibilities of the Parent**.  On and after the Effective Date, and without further order of the Bankruptcy Court, the Parent shall be appointed estate representative under section 1123 of the Bankruptcy Code and shall be solely responsible for and shall have authority to: (a) pay all fees payable under 28 U.S.C. § 1930; (b) file any post-Confirmation reports required by the Bankruptcy Code or the Bankruptcy Court and (c) move for the entry of a Final Decree and prepare and file any pleadings as may be required by the Bankruptcy Court in connection with the Final Decree and the closing of the Chapter 11 Case.

       **5.8.  Release of Claims by Releasing Lenders**.  On the Effective Date, each of the Lenders voting in favor of the Plan (each a "Releasing Lender") and Clayton, on behalf of itself and each of its agents, successors, assigns and representatives of any kind (collectively, the "Releasing Lender Parties"), shall and hereby does voluntarily forever release and discharge the Debtor, any other obligors under the Note, the Guarantor, any obligors under any other guarantees of the Note (if any) and each of such Person's respective agents, successors, assigns and representatives of any kind (collectively, the "Debtor Parties") from any and all claims, demands, causes of action and rights of every kind, nature or character arising or existing on or before the Effective Date arising out of or in any way related to the Note, the Guarantee, any other guarantees of the Note or the Property; whether absolute, inchoate or contingent; whether determined or undetermined, known or unknown, proven or unproven; whether held individually, jointly, or jointly and severally; whether arising directly, indirectly, derivatively, or by way of any legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets or otherwise; whether for compensation, relief, protection, punishment or any other remedy or result of any kind, character or nature; whether based upon any intentional or negligent conduct, strict liability, any tort of any kind, upon any

1  breach of any contract or upon any other grounds or upon any other theory whatsoever; whether

2  asserted or subject to assertion by complaint, cross-complaint, counterclaim, affirmative defense, or

3  other pleading, by motion, by notice or otherwise; whether asserted or subject to assertion in any

4  jurisdiction, in any court or other forum or with any federal, state, county, municipal or other

5  governmental authority, agency or official; and whether arising at law, in equity or otherwise.

6      **5.9.  Release of Claims by Debtor Parties**.  On the Effective Date, each Debtor Party

7  hereby forever releases and discharges each Releasing Lender Party from any and all claims,

8  demands, causes of action and rights of every kind, nature or character arising or existing on or

9  before the Effective Date arising out of or in any way related to the Note, the Guarantee, any other

10  guarantees of the Note (if any) or the Property; whether absolute, inchoate or contingent; whether

11  determined or undetermined, known or unknown, proven or unproven; whether held individually,

12  jointly, or jointly and severally; whether arising directly, indirectly, derivatively, or by way of any

13  legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets or

14  otherwise; whether for compensation, relief, protection, punishment or any other remedy or result of

15  any kind, character or nature; whether based upon any intentional or negligent conduct, strict

16  liability, any tort of any kind, upon any breach of any contract or upon any other grounds or upon

17  any other theory whatsoever; whether asserted or subject to assertion by complaint, cross-complaint,

18  counterclaim, affirmative defense, or other pleading, by motion, by notice or otherwise; whether

19  asserted or subject to assertion in any jurisdiction, in any court or other forum or with any federal,

20  state, county, municipal or other governmental authority, agency or official; and whether arising at

21  law, in equity or otherwise.

22      **5.10.  Corporate Authority.**  The entry of the Confirmation Order shall constitute

23  authorization for the Debtor to take or cause to be taken all corporate actions necessary or

24  appropriate to implement all provisions of, and consummate, the Plan, and the Plan Documents prior

25  to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed

26  to have been authorized and approved by the Bankruptcy Court without further approval, act or

27  action under any applicable law, order, rule, or regulation, including, without limitation, any action

28

required by holders of Old Membership Units, including, among other things, the issuance of Class A Membership Interests and Class B Membership Interests, and the adoption of the New Operating Agreement under the Plan.

## ARTICLE 6. CONDITIONS PRECEDENT

**6.1. Condition to Confirmation**. It is a condition precedent to Confirmation that the Bankruptcy Court enter a Confirmation Order in form and substance reasonably acceptable to the Debtor and Clayton.

**6.2. Conditions to Effectiveness**. The following are conditions precedent to the occurrence of the Effective Date:

        (a)      the Confirmation Date shall have occurred;

        (b)      the Confirmation Order shall have been entered and shall be a Final Order;

        (c)      each of the "Company Conditions" set forth in the New Operating Agreement shall have been satisfied;

        (d)      no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, remain pending;

        (e)      the Debtor shall have received all approvals necessary or appropriate to substantially consummate the Plan; and

        (f)      each and every Plan Document shall be fully executed and in form and substance reasonably satisfactory to the Debtor and Clayton.

**6.3. Waiver of Conditions**. Conditions to Confirmation and the occurrence of the Effective Date may be waived, in whole or in part, by the Debtor at any time with the consent of Clayton or an order of the Bankruptcy Code.

**6.4. Failure of Conditions**. If the Effective Date shall not occur, the Debtor and all other parties in interest shall retain all their rights and remedies as if the Plan had not been proposed. Among other things, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver of any Claims against or equity interests in the Debtor or (b) prejudice in any manner the rights of the Debtor or the Lenders.

## ARTICLE 7. [RESERVED]

## ARTICLE 8. DISPUTED CLAIMS

**8.1. Objection Deadlines.** Any objections to Administrative Claims and all other Claims made after the Effective Date shall be filed and served by the Debtor on the holders of such Administrative Claims and Claims not later than sixty (60) days after the Effective Date or such later date as may be approved by the Bankruptcy Court via *ex parte* request.

**8.2. Prosecution of Disputed Claims.** The Debtor, as estate representative, may object to the allowance of Claims and Administrative Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 13.1.

**8.3. Entitlement to Plan Distributions upon Allowance.** Notwithstanding any other provision of the Plan, no Distribution shall be made with respect to any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when), the holder of such Allowed Claim shall thereupon become entitled to receive Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

## ARTICLE 9. EFFECT OF CONFIRMATION

**9.1. Revesting of Assets.** Subject to the provisions of the Plan and the Confirmation Order, the property of the Estate, including, without limitation, the Property, shall vest in the Debtor on the Effective Date. As of the Effective Date, all such property, including, without limitation, the Property, shall be free and clear of all Claims, Liens and equity interests, including, without limitation, any claims arising from the Note, any Liens arising from the Deed of Trust and the Old Membership Units to the fullest extent permitted by section 1141(c) of the Bankruptcy Code. From and after the Effective Date, the Debtor shall be free of any restriction imposed by the Bankruptcy

1    Court, the Bankruptcy Code and the Bankruptcy Rules, other than the obligations set forth in the

2    Plan, or the Confirmation Order.

3        **9.2. Discharge**.  Except as provided in the Plan or the Confirmation Order, the rights

4    afforded under the Plan and the treatment of Claims and equity interests under the Plan are in

5    exchange for and in complete satisfaction, discharge, and release of, all Claims.  Except as provided

6    in the Plan or the Confirmation Order, Confirmation discharges the Debtor and the reorganized

7    Debtor from all Claims or other debts that arose before the Effective Date, and all debts of the kind

8    specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of

9    claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a

10   Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of

11   a Claim based on such debt has accepted the Plan.

## ARTICLE 10.  RETENTION OF JURISDICTION

13       Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

14   Date, the Bankruptcy Court shall retain and have all authority and jurisdiction as is allowed under

15   the Bankruptcy Code and other applicable law to enforce the provisions, purposes, and intent of the

16   Plan including, without limitation, matters or proceedings that relate to:

17       (a)    allowance, disallowance, determination, liquidation, classification, estimation,

18   or establishment of the priority or secured or unsecured status of any Claim, including, without

19   limitation, the resolution of any request for payment of any Administrative Claim and the resolution

20   of any and all objections to the allowance or priority of Claims;

21       (b)    requests for payment of Claims entitled to priority under section 507(a) of the

22   Bankruptcy Code, including, without limitation, compensation and reimbursement of expenses for

23   Professionals to the extent Bankruptcy Court approval therefore is required under the Plan or the

24   Confirmation Order;

25       (c)    the title, rights or interests of the Debtor in any property, including, without

26   limitation, the Property and the recovery of all assets and property of the Estate wherever located;

27

28

1      (d)    any right, power, action, or duty of the Debtor, the Parent, Clayton or the

2  Lenders under the Plan;

3      (e)    any determination or estimation necessary or appropriate under section 505 of

4  the Bankruptcy Code or other determination or estimation relating to tax returns filed or to be filed

5  by the Debtor for periods through the end of the fiscal year in which the Effective Date occurs,

6  including, without limitation, the determination of the amount of taxes, net operating losses, tax

7  attributes, tax benefits, tax refunds, and related matters of the Debtor;

8      (f)    ensuring that Distributions to holders of Allowed Claims are accomplished in

9  accordance with the Plan;

10     (g)    resolution of controversies and disputes, including, without limitation, the

11 correction of any mistake, defect, or omission regarding consummation, interpretation or

12 enforcement of the Plan, the Confirmation Order, and any agreements referred to in the Plan or

13 executed in contemplation of or to implement the Plan;

14     (h)    resolution of any motions, adversary proceedings, contested or litigated

15 matters, and any other matters involving the Debtor that may be pending on the Effective Date;

16     (i)    entry of such orders as may be necessary or appropriate to implement or

17 consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements

18 or documents created in connection with the Plan;

19     (j)    modification of the Plan before or after the Effective Date under section 1127

20 of the Bankruptcy Code or any contract, instrument, release, or other agreement or document created

21 in connection with the Plan; or remedy any defect or omission or reconcile any inconsistency in any

22 Bankruptcy Court order, the Plan, or any contract, instrument, release, or other agreement or

23 document created in connection with the Plan in such manner as may be necessary or appropriate to

24 consummate the Plan, to the extent authorized by the Bankruptcy Code;

25     (k)    the entry of an order including injunctions necessary to enforce the title,

26 rights, and powers of the Debtor and the purposes and intent of the Plan, and to impose such

27

28

limitations, restrictions, terms and conditions of such title, rights and powers as the Bankruptcy Court may deem necessary;

(l)     implementation of the provisions of the Plan and entry of such orders (i) in aid of Confirmation of the Plan, including, without limitation, appropriate orders to protect the Debtor from actions by holders of Claims, or (ii) as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(m)     determination of any other matters that (i) may arise in connection with or relate to the Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order except as otherwise provided in the Plan, or (ii) are otherwise provided under the Bankruptcy Code or other applicable law; and

(n)     entry of a Final Decree closing the Chapter 11 Case, including, without limitation, provisions for injunctive relief as may be equitable, consistent with Bankruptcy Rule 3022 and for retention of jurisdiction for the Bankruptcy Court for purposes of this Article 10. Notwithstanding anything set forth in this Article 10, nothing in the Plan or the Confirmation Order shall provide the Bankruptcy Court with any jurisdiction to determine the rights of the Debtor, the Parent, the Guarantor or any of the Lenders under or in connection with NRS §645B.340.

## ARTICLE 11. AMENDMENT AND WITHDRAWAL OF PLAN

**11.1. Amendment of the Plan**. At any time before the Confirmation Date, the Debtor may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code; <u>provided</u> that the Debtor may not materially modify the treatment of any Class that has accepted the Plan without the consent of such Class. After the Confirmation Date and before substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission in, or reconcile any inconsistencies in the Plan or the Confirmation Order, and to implement such action as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan;

provided, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

**11.2. Revocation or Withdrawal of the Plan**. The Debtor reserves the right to revoke or withdraw the Plan at any time and for any reason before the Confirmation Date. Without limiting the generality of the foregoing, the Debtor may withdraw the Plan in the event that any Class does not accept the Plan or if there is substantial opposition to the Plan from Clayton or any Lender notwithstanding such acceptance. If the Plan is withdrawn or revoked, then the Plan shall be deemed null and void, and nothing contained in the Plan or any Plan Documents shall be deemed a waiver of any Claims by or against the Debtor or any other Person in any further proceedings involving the Debtor.

## ARTICLE 12.  ACCEPTANCE OR REJECTION OF THE PLAN

**12.1. Impaired Classes to Vote**. Each holder of a Claim or equity interest in an impaired Class shall be entitled to vote separately to accept or reject the Plan unless such holder is deemed to accept or reject the Plan.

**12.2. Acceptance by Class of Creditors**. An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

## ARTICLE 13.  MISCELLANEOUS

**13.1. Settlement of Objections after Effective Date**. From and after the Effective Date, the Debtor, in its capacity as estate representative, may litigate to Final Order, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

**13.2. Holding of, and Failure to Claim, Undeliverable Distributions**. All Distributions other than Distributions to the Lenders are to be made to the holder of each Allowed Claim by the Debtor as estate representative at the address of such holder listed on the Schedules or proof of claim filed by such holder at the time of such Distribution. Distributions to the Lenders are to be made by

tendering such Distributions to the Manager for the benefit of the Lenders. If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Debtor is notified of such holder's then current address, at which time all required Distributions shall be made to such holder. Undeliverable Distributions shall be held by the Debtor until such Distributions are claimed. All Claims for undeliverable Distributions must be made within ninety (90) days following a Distribution. After such date, all unclaimed Distributions shall be allocated pro rata to the members of the Class related to such Distribution notwithstanding any federal or state escheat laws to the contrary.

**13.3. Fractional Amounts**. Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

**13.4. Ex Parte Relief**. Upon *ex parte* motion by the Debtor after the Confirmation Date, the Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to instruct and direct the Debtor and others, and to facilitate the Distributions contemplated in the Plan.

**13.5. Exculpation**. The Debtor, the Parent, the Manager, Clayton and its affiliates, and each member of the Steering Committee and their respective officers, directors, agents, managers, shareholders or attorneys shall not be liable for any actions or omissions taken or not taken in connection with or arising out of the administration of the Chapter 11 Case, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.

**13.6. Binding Effect**. The Plan shall be binding on, and shall inure to the benefit of, the Debtor and the holders of all Claims and equity interests and their respective successors and assigns.

**13.7. Governing Law**. Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations of the Debtor, all Creditors and any other Person arising

1    under the Plan shall be governed by, and construed and enforced in accordance with, the internal

2    laws of the State of Nevada, without giving effect to Nevada's choice of law provisions.

3    **13.8. Modification of Payment Terms**. At any time after the Effective Date, the Debtor

4    may modify the treatment of any Allowed Claim or equity interest in any manner adverse to the

5    holder of such Claim or equity interest only with the prior written consent of the holder whose

6    Allowed Claim or equity interest treatment is being adversely affected.

7    **13.9. United States Trustee Fees**. The Parent shall pay all quarterly fees payable to the

8    U.S. Trustee after Confirmation in connection with the Chapter 11 Case, consistent with applicable

9    provisions of the Bankruptcy Code, Bankruptcy Rules, and 28 U.S.C. § 1930(a)(6).

10   **13.10. Computation of Time**. In computing any period of time prescribed or allowed by

11   the Plan, the day of the act, event, or default from which the designated period of time begins to run

12   shall not be included. The last day of the period so computed shall be included unless it is a

13   Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in the

14   Bankruptcy Court, a day on which weather or other conditions have made the clerk's office

15   inaccessible, in which event the period runs until the end of the next day which is not one of the

16   aforementioned days.

17   **13.11. Final Decree**. After the Estate is fully administered, the Parent shall file an

18   application for a Final Decree, and shall serve the application on the U.S. Trustee, together with a

19   proposed Final Decree.

20   **13.12. No Admissions**. AS TO CONTESTED MATTERS, ADVERSARY

21   PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF

22   ACTIONS, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN

23   ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER

24   AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS PLAN SHALL NOT BE

25   ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE

26   CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER

27   LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY

28

INTERESTS IN, THE DEBTOR, AS A DEBTOR AND DEBTOR-IN-POSSESSION IN THIS CHAPTER 11 CASE.

1         IN WITNESS WHEREOF, the Debtor caused the Plan to be executed as of December 1,

2   2010.

3                       C-SWDE382, LLC, a Nevada limited liability company

                       By:   LEHM, LLC, its Manager

4

5                     By   _____

6                          John A. Ritter, its Manager

LOS ANGELES 885255 v2

DEBTOR'S PLAN OF REORGANIZATION DATED
DECEMBER 1, 2010

# FULLY RESTATED AND AMENDED

# OPERATING AGREEMENT

# OF

## _____, LLC
a Nevada limited liability company

_____

THE INTERESTS IN THE COMPANY EVIDENCED BY THIS
AGREEMENT AND THE ARTICLES OF ORGANIZATION OF THE
COMPANY HAVE NOT BEEN REGISTERED WITH THE SECURITIES
AND EXCHANGE COMMISSION (OR UNDER THE SECURITIES LAWS
OF ANY STATE), BUT HAVE BEEN ISSUED PURSUANT TO THE
PRIVATE OFFERING EXEMPTION UNDER THE SECURITIES ACT OF
1933, AS AMENDED. ACCORDINGLY, THE SALE, TRANSFER, PLEDGE,
HYPOTHECATION, OR OTHER DISPOSITION OF ANY OF SAID
INTERESTS ARE RESTRICTED AND MAY NOT BE ACCOMPLISHED
EXCEPT IN ACCORDANCE WITH THIS AGREEMENT, AND AN
APPLICABLE REGISTRATION STATEMENT OR AN OPINION OF
COUNSEL FOR THE COMPANY THAT A REGISTRATION STATEMENT
IS UNNECESSARY.

_____

<u>Table of Contents</u>

<u>Page</u>

## ARTICLE 1
## FORMATION AND PURPOSE OF LIMITED LIABILITY COMPANY

Section 1.1    Formation of Limited Liability Company ..................................................... 1

Section 1.2    Effective Date ..................................................................................................... 1

Section 1.3    Articles of Organization .................................................................................. 1

Section 1.4    Name ..................................................................................................................... 1

Section 1.5    Office Where Records Are Maintained ...................................................... 2

Section 1.6    Registered Agent; Registered Office ......................................................... 2

Section 1.7    Purpose ................................................................................................................. 2

## ARTICLE 2
## DEFINITIONS

Section 2.1    Affiliate ................................................................................................................ 2

Section 2.2    Articles of Organization .................................................................................. 2

Section 2.3    Business Plan ...................................................................................................... 2

Section 2.4    Capital Contribution ........................................................................................ 3

Section 2.5    Carry Costs .......................................................................................................... 3

Section 2.6    Code ...................................................................................................................... 3

Section 2.7    Company Conditions ........................................................................................ 3

Section 2.8    Company Property ............................................................................................. 3

Section 2.9    Class B Member Obligations ......................................................................... 3

Section 2.10   Class B Member Upfront Payment ............................................................... 3

Section 2.11   Gross Asset Value ............................................................................................. 4

Section 2.12   Manager ............................................................................................................... 4

Section 2.13   Member ................................................................................................................. 5

Section 2.14   Membership Interest ......................................................................................... 5

Section 2.15   Original Principal Loan Amount .................................................................. 5

Section 2.16   Project Budget ................................................................................................... 5

Section 2.17   Property ................................................................................................................ 5

Section 2.18   Steering Committee .......................................................................................... 5

Table of Contents

Page

Section 2.19    Units ................................................................................................... 5

Section 2.20    Valuation Date .................................................................................... 5

Section 2.21    Water Rights ....................................................................................... 5

Section 2.22    Work ................................................................................................... 5

ARTICLE 3
MEMBERS AND MEMBERSHIP

Section 3.1    Members; Classes of Membership ...................................................... 6

Section 3.2    New Members ....................................................................................... 6

Section 3.3    Liability of Members ............................................................................. 6

Section 3.4    Indemnification .................................................................................... 6

Section 3.5    Authorized Class A Membership Units ................................................ 7

Section 3.6    Class B Membership ............................................................................. 7

Section 3.7    Voting ................................................................................................... 7

Section 3.8    Meetings of Members .......................................................................... 9

Section 3.9    Tax Matters Member ......................................................................... 10

ARTICLE 4
CAPITALIZATION

Section 4.1    Initial Capital Contributions .............................................................. 10

Section 4.2    Additional Capital Contributions ....................................................... 10

Section 4.3    Failure of a Class A Member to Make an Additional Capital Contribution ............ 11

Section 4.4    Capital Shortfall Loans ...................................................................... 11

Section 4.5    Supplemental Interest and Costs ...................................................... 11

Section 4.6    Capital Accounts ............................................................................... 11

Section 4.7    Manager's Modification of Capital Accounts .................................... 12

Section 4.8    Return of Contributions ..................................................................... 12

Section 4.9    Conventions for Calculating Capital Contribution Returns .............. 12

ARTICLE 5
PROFITS AND LOSSES; DISTRIBUTIONS

Section 5.1    Tax Status, Reports and Allocations .................................................. 13

Section 5.2    Certain Gross Asset Value/Tax Differences ...................................... 14

Table of Contents

Page

Section 5.3    Minimum Gain and Income Offsets .................................................. 14

Section 5.4    Net Cash from Operations and Net Capital Proceeds ...................... 17

Section 5.5    Allocations ........................................................................................ 17

Section 5.6    Tax Allocations: Code Section 704(c) .............................................. 18

Section 5.7    Distributions to Members .................................................................. 18

Section 5.8    Adjustments Among Paying and Non-Paying Members .................... 20

Section 5.9    Changes in Membership Interests ..................................................... 20

Section 5.10   Persons Entitled to Distributions ...................................................... 20

ARTICLE 6
ACCOUNTING, RECORDS AND REPORTS

Section 6.1    Fiscal Year ........................................................................................ 20

Section 6.2    Accounting ........................................................................................ 20

Section 6.3    Company Books ................................................................................. 21

Section 6.4    Reports to Members .......................................................................... 21

Section 6.5    Capital Accounts ............................................................................... 21

Section 6.6    Bank Accounts .................................................................................. 21

Section 6.7    Title to Property ................................................................................ 21

ARTICLE 7
BUSINESS OPERATIONS AND MANAGEMENT

Section 7.1    Management ....................................................................................... 21

Section 7.2    Manager ............................................................................................. 22

Section 7.3    Steering Committee ........................................................................... 22

Section 7.4    Delivery of Annual Reports .............................................................. 23

Section 7.5    Company Budget ................................................................................ 23

Section 7.6    Management Fee ................................................................................ 24

Section 7.7    Compensation and Fees .................................................................... 24

Section 7.8    Time Devoted to Business; Independent Activities ........................... 24

Section 7.9    Limits on Powers ............................................................................... 25

Section 7.10   Class B Member Obligations ............................................................ 25

Section 7.11   Limited Role of Members ................................................................. 26

Table of Contents

Page

Section 7.12    Transactions With Interested Parties ...............................................27

Section 7.13    Real Estate Brokerage Commissions ............................................27

## ARTICLE 8
## TRANSFERS OF MEMBERSHIP INTERESTS

Section 8.1    Restrictions ..........................................................................27

Section 8.2    Sale to a Non-Member .............................................................27

Section 8.3    Transferees; Charging Orders ...................................................28

Section 8.4    Distributions and Allocations with respect to Transferred Membership Interest ....29

Section 8.5    Taxpayer Information.................................................................29

Section 8.6    Admission of Additional Members ...............................................29

Section 8.7    Revocable Trust and Other Estate Planning Entities ......................30

Section 8.8    Restrictive Legend...................................................................30

## ARTICLE 9
## TERM AND TERMINATION

Section 9.1    Duration ...............................................................................30

Section 9.2    Dissolution of Company ...........................................................30

Section 9.3    Winding up of the Company.......................................................30

Section 9.4    Termination of Company ..........................................................31

## ARTICLE 10
## REPRESENTATIONS AND WARRANTIES

Section 10.1    Representations and Warranties.................................................31

Section 10.2    Restrictive Legend...................................................................33

## ARTICLE 11
## MISCELLANEOUS

Section 11.1    Governing Law........................................................................34

Section 11.2    Amendments..........................................................................34

Section 11.3    Confidentiality........................................................................34

Section 11.4    Defaults................................................................................35

Section 11.5    Notices.................................................................................35

Section 11.6    Counsel to Company ...............................................................35

Table of Contents

<u>Page</u>

Section 11.7    Severability ........................................................................................................35

Section 11.8    Entire Agreement ...............................................................................................36

Section 11.9    Binding Effect ....................................................................................................36

Section 11.10   Construction .......................................................................................................36

Section 11.11   Time ...................................................................................................................36

Section 11.12   Heading ..............................................................................................................36

Section 11.13   Incorporation by Reference ...............................................................................36

Section 11.14   Variation of Pronouns .......................................................................................36

Section 11.15   Waiver Of Action for Partition ..........................................................................36

Section 11.16   Counterpart Execution .......................................................................................36

Section 11.17   Further Documents .............................................................................................36

Section 11.18   Attorneys' Fees ..................................................................................................36

Section 11.19   Legal Representation ..........................................................................................36

Section 11.20   Elections Made by Company ..............................................................................37

Section 11.21   Dispute Resolution .............................................................................................37

THIS FULLY RESTATED AND AMENDED OPERATING AGREEMENT (**"Agreement"**), fully restates and amends the Operating Agreement dated as of the _____ day of _____, 2010, is made by and among the undersigned Manager and the Members initially designated in the Confirmation Order (as defined below).

WHEREAS, _____, LLC (the **"Company"**) filed for protection under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Code for the District of Nevada (the "**Bankruptcy Court**"); and

WHEREAS, the Bankruptcy Court confirmed a plan of reorganization for the Company pursuant to a final order duly entered in the Company's bankruptcy case (the "**Confirmation Order**"); and

WHEREAS, the Plan provides for and the Confirmation Order authorizes the Company to issue equity to the Members and to adopt this Operating Agreement; and

WHEREAS, the Members agree that, as provided in the Plan, this Operating Agreement is necessary and advisable to set out the agreement of the Members as to the conduct of business and the affairs of the Company, and desire to enter into such agreement, in form and content as set forth herein.

NOW, THEREFORE, the Members hereby agree as follows:

## ARTICLE 1
## FORMATION AND PURPOSE OF LIMITED LIABILITY COMPANY

Section 1.1    Formation of Limited Liability Company.  The Company shall be operated as a limited liability company pursuant to the provisions of Chapter 86 of the Nevada Revised Statutes ("**NRS**").  The rights and obligations of the Members in the operation of the Company as herein provided shall be conducted and construed in accordance with NRS Chapter 86.

Section 1.2    Effective Date.  The "**Effective Date**" of this Operating Agreement shall be the effective date of the Company's Plan of Reorganization as set forth in the Confirmation Order attached hereto as Exhibit "A".

Section 1.3    Articles of Organization.  The Articles of Organization for the Company have been or shall be filed in the Office of the Secretary of State of Nevada.  The Members further agree to acknowledge, file, record, and/or publish as necessary, such amendments to the Articles of Organization or to this Agreement as may be required by this Agreement or by law, and such other documents as may be appropriate to comply with the requirements of law for the formation, preservation, and/or operation of the Company.

Section 1.4    Name.  The Company's business shall be conducted solely under the name of _____, LLC or any fictitious name agreed upon by the Members, for which the appropriate certificate of fictitious name shall be filed with the appropriate government agency.

Section 1.5    <u>Office Where Records Are Maintained</u>.  The office and place of business of the Company, at which Company records must be maintained, is 3041 W. Horizon Ridge Parkway Suite 155, Henderson, Nevada, 89052, or at such other place in the State of Nevada as the Manager shall from time to time determine.

Section 1.6    <u>Registered Agent; Registered Office</u>.  The name and address of the Company's registered agent for service of process in Nevada is _____ *[Clayton affiliate]* 3041 W. Horizon Ridge Parkway Suite 155, Henderson, Nevada, 89052.  The foregoing address shall be the Company's registered office in the State of Nevada.  The Manager may from time to time change the Company's registered agent for service of process and registered office.

Section 1.7    <u>Purpose</u>.

(a)    The purpose of the Company is to acquire the Property, to own, hold for investment, finance, operate, and manage the Property, to sell the Property, and to exercise all of the rights and perform all of the obligations that relate to such activities all in substantial accordance with the Business Plan, and to engage in such other activities directly related to the foregoing business as may be necessary, advisable or appropriate.

(b)    It is the intent of all Members that the Company shall be taxed as a partnership, and the Company shall not enter into any business activity, take any action, or fail to take any required action, that would jeopardize taxation of the Company as a partnership.

**ARTICLE 2**
**DEFINITIONS**

The following words and phrases used in this Agreement shall have the following meanings:

Section 2.1    <u>Affiliate</u>.  "**Affiliate**" shall mean with respect to any person:  (a) any person directly or indirectly controlling, controlled by, or under common control with such person; (b) any officer, director, general partner, member, or trustee of such person; or (c) any person who is an officer, director, general partner, member, or trustee of any person described in clause (a) or (b) of this sentence.  For purposes of this definition, the terms "controlling," "controlled by," and "under common control with" shall mean the possession, whether direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract, or otherwise, or the power to elect at least fifty percent (50%) of the directors, managers, members, or persons exercising similar authority with respect to such persons or entities.

Section 2.2    <u>Articles of Organization</u>.  "**Articles of Organization**" shall mean the articles of organization filed with the Secretary of State to form the Company pursuant to NRS § 86.151.

Section 2.3    <u>Business Plan</u>.  "**Business Plan**" shall mean the proposed annual plan of the Company with respect to the ownership, preservation, operation, management, leasing and disposition of the Property, including an anticipated schedule for the critical milestones and any Work to be performed by the Class B Member to preserve and/or enhance the value of the

-2-

Property, as the same may be amended from time to time in accordance with this Agreement.  A copy of the initial Business Plan is attached hereto as Exhibit "D" which covers the period from the Effective Date through December 31, 2011.

Section 2.4    Capital Contribution.  **"Capital Contribution"** means a capital contribution made by a Member to the Company in accordance with Article 4 hereof.  Any Capital Contribution of property other than cash shall be taken into account at the Gross Asset Value of such property reduced by the amount of liabilities assumed by the Company (or to which the Company takes subject) with respect to such contribution, from time to time.

Section 2.5    Carry Costs.  **"Carry Costs"** shall mean the ongoing costs of the Company and of maintaining the Property including, without limitation, real estate taxes, insurance premiums, accounting and legal costs, the fee due to Manager pursuant to Section 7.5 and the cost of any permits, licenses or other governmental fees or impositions, together with the out of pocket costs incurred by the Manager in the performance of its duties hereunder.

Section 2.6    Code.  **"Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

Section 2.7    Company Conditions.  "**Company Conditions**" shall mean each of the following conditions:  (a) the issuance of the Confirmation Order approving the Company's Plan of Reorganization and the requisite appeal period has passed (a copy of which shall be attached hereto as Exhibit "A"), (b) the transfer of the Property to the Company, free and clear of all liens and encumbrances other than the security documents evidencing the Note to Prior Owner (each such capitalized term is defined in Article 2), (c) the payment by the Class B Member of the Class B Member Upfront Payment, and (d) the payment and/or reimbursement by the Class B Member of all attorney fees, costs and expenses incurred by Clayton in connection with this Agreement and the Company's Plan of Reorganization.

Section 2.8    Company Property.  **"Company Property"** shall mean the Property and any other asset at any time owned by the Company.

Section 2.9    Class B Member Obligations.  "**Class B Member Obligations**" shall mean the obligations of the Class B Member as set forth in Section 7.9 hereof.

Section 2.10    Class B Member Upfront Payment.  "**Class B Member Upfront Payment**" shall mean cash in the amount of $_____ due from the Class B Member and paid to the Company.  The Members expressly agree that $_____ of the Class B Member Upfront Payment shall constitute the Class B Member's initial capital contribution ("**Class B Member's Initial Contribution**") due from the Class B Member pursuant to Section 4.1(b), and that except for the Class B Member's Initial Contribution no part of the Class B Member Upfront Payment shall (a) constitute any part of the Class B Member's Initial Capital Contribution, Capital Contribution, Additional Member Contribution, Supplemental Capital Contribution or any other Contribution by the Class B Member hereunder; or (b) constitute a loan by the Class B Member to the Company hereunder.

The Class B Member Upfront Payment is in an amount reasonably determined by the Class B Member and the Manger to pay certain costs relating to the Company Property from October 31,

-3-

2009 through the end of the 2011 calendar year and to reimburse LST Investments LLC, a Nevada limited liability company dba Clayton Mortgage & Investment ("**Clayton**") and certain Clayton investors for certain costs relating to the Company Property and the enforcement of the Note (and related loan documents securing the Note). Specifically, the Class B Member Upfront Payment shall be used to pay the following: the payment of real property taxes attributable to the Property for the period of October 31, 2009 through December 31, 2011, the payment to Manager of its management fees (due pursuant to Section 7.5 hereof) from May 1, 2010 through December 2011, and the payment of fees and expenses previously incurred by Clayton in connection with the enforcement of the Note (and related loan documents securing the Note). If, however, the amount of the Carry Costs for the period from the Effective Date through the end of the 2011 calendar year exceeds the amount of the Class B Member Upfront Payment allocated to the payment of such Carry Costs, then the difference shall be due from the Members as an additional capital contribution subject to the provisions of Article 4 hereof.

Section 2.11    Gross Asset Value. **"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such assets, as determined by the contributing Member and the Company; the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times, (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for a Membership Interest in the Company if the Member so elects; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(b)    The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of the asset on the date of distribution, and

(c)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Code Section 754; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section to the extent the Manager determines that an adjustment pursuant to this Section 2.11(c) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section.

(d)    If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (a) and (b) hereof, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing profits and losses.

Section 2.12    Manager. **"Manager"** shall mean the person or entity, or, collectively, the persons or entities, which have the right and power to manage the business and affairs of the Company, as provided in further detail in this Agreement.

Section 2.13    Member.  **"Member"** shall mean a person, as defined in NRS § 86.081, who owns an interest in the Company, including New Members when the transfer is permitted under this Agreement, all evidenced by a Certificate of Unit Ownership.

Section 2.14    Membership Interest.  **"Membership Interest"** shall mean the interests of each Member in the Company.    The Membership Interest of the Class A Member shall be expressed as a percentage, and shall equal, as of any date, the ratio of the number of Units held by such Class A Member to the aggregate Units held by all Class A Members on such date, and will be evidenced by a "Certificate of Unit Ownership".  There shall be only one (1) Class B Member. A Membership Interest is personal property.

Section 2.15    Original Principal Loan Amount**.  "Original Principal Loan Amount"** prior to the creation of the Company, the Property was held by a predecessor-in-interest entity ("**Prior Owner**").  Subject to a promissory note dated _____, 20___, (the "**Note**") the Class A Members had loaned the Prior Owner the original principal amount of $_____ (the "**Original Principal Loan Amount**").  The Note was secured by a deed of trust on the Property, as well as personal guarantee(s).  Upon the Effective Date of this Agreement, the Note, deed of trust and guarantees will have been extinguished, leaving the Property and this Company unencumbered by debt as of that date (although debt may be incurred by the Company thereafter as set forth herein).

Section 2.16    Project Budget.  "**Project Budget**" shall mean the annual budget for the ownership, maintenance, preservation, leasing, marketing and sale of the Property, including the Carry Costs, as the same may be amended from time to time in accordance with this Agreement. The Project Budget shall be proposed by the Manager and approved annually by the Steering Committee in accordance with Section 7.3(e) hereof.  A copy of the initial Project Budget is attached hereto as Exhibit "E" which covers the period from the Effective Date through December 31, 2011.

Section 2.17    Property.  "**Property**" shall mean the real property known as APN _____, located in Clark County, Nevada, and the Water Rights (if any), all as more particularly described on Exhibit "B" attached hereto, together with all rights and interests appurtenant thereto.

Section 2.18    Steering Committee.  "**Steering Committee**" shall mean a committee appointed by the Class A Members and the Manager in accordance with Section 7.3 hereof, which shall have the rights, powers and obligations set forth in that Section.

Section 2.19    Units.  **"Units"** shall have the meaning set forth in Section 3.5 below.

Section 2.20    Valuation Date.  "**Valuation Date**" shall mean the date that Company assets are valued for any reason.

Section 2.21    Water Rights.  **"Water Rights"** shall mean those certain certificated water rights (if any) described on Exhibit "B" attached hereto.

Section 2.22    Work.  "**Work**" shall mean the acts or undertakings reasonably necessary to secure, obtain, fulfill or perform the general management of the Property, including such zone

changes, municipal agreements, permits, easements, dedications that are determined to be reasonably necessary to preserve and/or enhance the value or marketability of the Property, or otherwise required by any applicable law, rule, zoning condition, entitlement, permit and/or approval applicable to the Property.  It is specifically intended that the Work, if any, is to be reasonably identified and detailed in the Business Plan.  The Work shall not include the obligation to design, develop or construct of any improvements on or for the benefit of the Property or any development management obligations unless such are specifically approved and expressly undertaken by the Class B Member upon terms it reasonably approves.

### ARTICLE 3
### MEMBERS AND MEMBERSHIP

Section 3.1    Members; Classes of Membership.    There shall be two (2) classes of membership in the Company, referred to herein as "**Class A Members**" and "**Class B Members**." The Class A Members of the Company are those persons and entities who have been issued a Certificate of Unit Ownership.  The identity of the Class A Members, and the Units and percentage of Membership Interest held by each such Member are listed on Exhibit "C" attached hereto.  The Class B Member is the Prior Owner.

Section 3.2    New Members.    Additional Members may be admitted at such times and on such terms as are provided herein.  New Members will only be admitted as Class A Members.

Section 3.3    Liability of Members.    No Member shall have any personal liability whatsoever to the creditors of the Company for the debts of the Company or any losses beyond the Member's Capital Contribution.  In accordance with Nevada law, a Member may, under certain circumstances, be required to return to the Company, for the benefit of the Company's creditors, amounts previously distributed to the Member as a return of Capital Contribution.  For purposes of this paragraph, the Members intend that no distribution to any Member of distributable funds shall be deemed a return or withdrawal of Capital Contribution, even if such distribution represents, for federal income tax purposes or otherwise (in whole or in part) a return of Capital Contribution, and that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.

Section 3.4    Indemnification.    Every person or entity which was or is a party to, or threatened to be made a party to, or is involved in any action, suit, or proceeding, whether civil, criminal, administrative, or investigative by reason of the fact that he, she or it, or a person for whom he, she or it is the legal representative, is or was: (i) a Member, Class A or Class B (whether Manager or not) or Manager; (ii) counsel for the Company; (iii) serving at the request of the Company; (iv) member of the Steering Committee, or (v) serving as the Company's representative or agent in a partnership, joint venture, trust, other enterprise, or any transaction; (hereinafter an **"Indemnifiable Person"**) shall be indemnified and held harmless by the Company to the fullest extent legally permissible under the laws of the State of Nevada from time to time, against all expenses, liabilities, and losses (including attorneys' fees, judgments, fines, and amounts paid to or to be paid in settlement) reasonably incurred or suffered in connection therewith.  Said indemnity shall not be applicable to any act or omission by the Indemnifiable Person which constitutes willful misconduct, fraud or gross negligence, or in the case of the Manager, violation of the standard of care set forth in Section 7.2.  Such right of indemnification shall be a contract right which may be

enforced in any manner desired by the Indemnifiable Person.  The expenses of an Indemnifiable Person incurred in defending a civil or criminal action, suit, or proceeding must be paid by the Company as incurred, in advance of the final disposition of the action, suit, or proceeding, upon receipt of an undertaking by or on behalf of the Indemnifiable Person to repay the amount if a court of competent jurisdiction ultimately determines that the Indemnifiable Person is not entitled to be indemnified by the Company.  Such right of indemnification shall not be exclusive of any other right which such Indemnifiable Person may have or hereafter acquire.  Without limiting the generality of such statement, the Indemnifiable Person shall be entitled to the right of indemnification under any other agreement, provision of law, or otherwise, if any, as well as under this Agreement.

Section 3.5     Authorized Class A Membership Units.  The Company shall be authorized to issue _____[One Unit per $1.00 of original principal]_____ (_____) Class A membership units ("**Units**").  Each Unit shall represent an ownership interest in the Company, including any and all benefits to which the holders of Units may be entitled as provided in this Agreement, together with all obligations of such members to comply with the terms and provisions of this Agreement.

Section 3.6     Class B Membership.  The Company shall have one (1) Class B Member, which membership represents an ownership interest in the Company, including any and all benefits and obligations of such Class B Member as provided in this Agreement.  The Class B Member shall have no obligation to contribute capital to the Company except to the extent required pursuant to Section 4.1, and shall have no voting rights other than with regard to the dissolution of the Company pursuant to Section 9.2(a).

Section 3.7     Voting.

(a)     Manager shall not undertake any Decision (defined below) without the consent of a majority of the members of the Steering Committee ("**Steering Committee Approval**").  "**Decisions**" are the following:

(i)     Amending or modifying the Business Plan, or any action or any decision that would cause the Company to be materially out of compliance with the Business Plan; and

(ii)     Amending or modifying the Budget, or any action or any decision that would cause the Company to be materially out of compliance with the Budget.

(b)     Manager shall not undertake any Major Decisions (defined below) without the consent of the Class A Members evidenced by the vote of the Class A Members holding at least sixty-five percent (65%) of the total number of Class A Membership Interests with respect to which votes have been cast ("**Majority Approval**").  The Manager shall maintain a written record of all voting by the Class A Members.

(i)     "**Major Decisions**" are the following:

(1)     Except to the extent permitted under Section 3.7(c) below, the sale of any asset of the Company, including without limitation the Property or any portion thereof;

-7-

(2)    Financing, refinancing or acquiring any debt that would result in the aggregate principal amount of debt exceeding an amount equal to ten percent (10%) of the Original Principal Loan Amount;

(3)    Institution or settlement of any claim, litigation, arbitration or confession of judgment with respect to matters in which the amount in dispute is in excess of $50,000;

(4)    Acquisition of any asset by the Company in excess of $50,000 (other than the Property);

(5)    Any amendment to this Agreement;

(6)    A change in the nature of the principal business of the Company;

(7)    Any act that would make it impossible to carry on the ordinary business of the Company;

(8)    The filing of a petition in bankruptcy or the entering into of an arrangement among creditors;

(9)    The entering into, on behalf of the Company, of any transaction constituting a reorganization, merger or consolidation; and

(10)    Issue additional Membership Interests in the Company or create additional classes of Membership Interests, or determine of the rights and preferences (whether senior, junior, or *pari passu*) of such additional Membership Interests and/or classes.

(ii)    Class A Members shall vote on all such matters submitted to such Members for approval within thirty (30) days after written notice from the Manager, which notice may be sent by e-mail or standard mail to the last known e-mail or mailing address of each Member, unless a longer voting period is provided in the notice from the Manager. In the event a Majority Approval is not obtained within the thirty (30) day voting period, then, within five (5) days after the end of the thirty (30) day voting period and unless greater than thirty-five percent (35%) of the Membership Interests have voted to reject the proposal, the Manager shall send a second notification to all Class A Members who did not submit a vote that a vote is being held, giving them another thirty (30) days to cast their vote. Upon expiration of the second thirty (30) day period, the Manager shall count the votes that have been cast in writing and make a determination whether sufficient affirmative votes have been received for a Majority Approval.

(c)    Notwithstanding the above, any sale of the Property which will result in a Minimum Distribution (as defined below) may be approved by the Steering Committee, if requested by the Manager, without the necessity of a vote of the Class A Members provided that the sale price is not less than the fair market value of the Property as determined by an independent M.A.I. appraiser selected by the Manager and paid for by the Company. As used herein, a

-8-

"**Minimum Distribution**" shall mean a total distribution to the Members of an amount that will return to the Class A Members all Additional Member Contributions and Supplemental Capital Contributions, together with all interest thereon as provided herein, and an amount equal to at least the Original Principal Loan Amount, as may be applicable.

(d)     Notice; Effect of Non-Submittal by Member.  Whenever the Manager is required or desires to obtain Majority Approval of any action by the Company, the Manager shall distribute to each Class A Member a summary of the proposed action by e-mail or standard mail to the last known e-mail or mailing address of each Member.  In the event a Class A Member's e-mail address (if any) and mailing address is outdated, incorrect, or otherwise results in a voting mailing to such Member being returned as undeliverable, and such Member does not otherwise submit a timely written vote on a proposal, then that Member's Membership Interest shall not be counted in determining whether there is a Majority Approval of such proposal.

Section 3.8     Meetings of Members.

(a)     Minutes shall be made of all formal Membership meetings.  A "formal meeting" is defined as a meeting at which Members and the Manager appear at one place at one time with a written meeting agenda meeting.  Proxies may be accepted at a formal meeting of Members but all proxies shall expire thirty (30) days after the date of the said meeting unless otherwise stated in the proxy.  Meetings may be by conference call or other audio or audiovisual means, provided that all in attendance may hear all others in attendance and be heard by them. Motions may be passed after discussion and Majority Approval.

(b)     No annual formal meeting shall be required.  In order to maintain a smooth flow of information, the Manager may communicate with the Members by phone, in writing, or in small groups in order to achieve consensus toward a vote on any matter.  It is anticipated that almost all meetings of the Company shall be informal.

(c)     The Manager shall give no less than thirty (30) days advance written notice of any formal meeting.  Notice may be sent by e-mail or standard mail to the last known e-mail or mailing address of each Member.  No notice need be given if all Members that attend a meeting resolve to dispense with the notice requirement and execute a written waiver of notice.

(d)     Voting by the Members on all Major Decisions (whether conducted by mail-in ballot or at a formal meeting) must be conducted through written ballot in a manner that preserves the confidentiality of the votes cast by each of the Members, except in those instances in which the Manager elects to conduct the vote through a written consent of the Members.  Class A Members shall be granted the right to inspect ballots (subject to the confidentiality provisions of the preceeding paragraph) and ballot results, and, if necessary, the Manager shall appoint inspectors of election whose determination of the outcome of any ballot shall be conclusive.

(e)     Notwithstanding anything contained in this Agreement to the contrary, the Members may take any action that may be taken by the Members, without a meeting, if such action is approved by the written consent of the Members holding the requisite voting power to approve such action.  A written consent pursuant to this paragraph may be executed in one or more counterparts and by facsimile.  Each written consent so executed shall be deemed an original.

Whenever action is taken by written consent, a meeting of the Members need not be called or noticed, but written notice if the vote will be sent to all Members at least five (5) business days in advance of the execution of the written consent.

Section 3.9    Tax Matters Member.    The Manager shall act as the **"Tax Matters Member"** for federal income tax purposes.  The Tax Matters Member shall mean the Member (i) designated as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code and (ii) whose responsibilities as Tax Matters Member include taking any actions on behalf of the Company outlined herein.  The Tax Matters Member shall consult with the Members in connection with any proposed tax positions and filings prior to submission for approval by the Members.

## ARTICLE 4
## CAPITALIZATION

Section 4.1    Initial Capital Contributions.

(a)    Class A Member.    Each Class A Member shall be issued a Certificate of Unit Ownership evidencing a Membership Interest in exchange for its previously held interest in the Note.  Each Class A Member shall receive one (1) Unit for each $1.00 of the Original Principal Loan Amount originally made by that Class A Member at the time said exchange is consummated, said amount being referred to herein as the **"Class A Member's Initial Contribution."**  Upon the satisfaction of each of the Company Conditions the Note and all documents executed in connection therewith including the guaranties will thereupon be extinguished and the deed of trust which secured the Note will be reconveyed.

(b)    Class B Member.    No later than the date which is five (5) business days after the expiration of any applicable appeal period following the confirmation of the Company's Plan of Reorganization, the Class B Member shall contribute to the Company in cash the Class B Member's Initial Contribution in the amount specified in Section 2.10 hereof.  The Class B Member's Initial Contribution shall bear interest at the rate of eight percent (8%) per annum, simple interest, from the date contributed until the date returned to the Class B Member.

Section 4.2    Additional Capital Contributions.    The Class A Members shall each contribute to the Company their proportionate shares of the Carry Costs and all other capital required by the Company to conduct the business of the Company in accordance with the Business Plan and the Project Budget then in effect (**"Additional Member Contributions"**).  As further provided in Section 7.4 below, annually the Manager shall prepare and distribute an updated Project Budget which shall include the Carry Costs.  Upon the Effective Date of this Agreement and annually thereafter the Manager shall make a capital call to the Class A Members to collect the funds necessary to pay the Carry Costs and the other additional capital required for the ensuing year in accordance with the Project Budget.  In the event that the Steering Committee and the Manager determine that the Company requires capital in addition to the Carry Costs then the Class A Members shall be responsible for contributing said additional capital to the Company on a pro-rata basis in proportion to their respective Membership Interests in the Company.  The Manager shall notify each Class A Member in writing of each required Additional Member Contribution.  Each Class A Member shall pay the full amount of its respective share of each such capital call within thirty (30) days after receipt of such notice.  Additional Member Contributions shall bear

interest at the rate of eight percent (8%) per annum, simple interest, from the date contributed until the date returned to the Class A Member.

Section 4.3     <u>Failure of a Class A Member to Make an Additional Capital Contribution</u>. In the event a Class A Member fails to timely contribute its share of a capital call, then the Manager shall give notice to the Class A Members that have made their required contributions (the **"Paying Members"**) requesting that they contribute the shortfall.  If multiple Paying Members are willing to contribute the shortfall, then each such Paying Member shall be entitled to contribute the portion of the shortfall equal proportion by which its Membership Interest bears to the total Membership Interests of all Paying Members willing to contribute the shortfall.  If the Paying Members are unwilling to contribute the entire shortfall then the Class B Member shall have the opportunity, but not the obligation, to contribute any remaining shortfall.  In addition to the standard 8% return for Capital Contributions set forth in Section 4.2, any such payment toward a capital shortfall by the Paying Members or the Class B Member (each a **"Supplemental Capital Contribution"**) shall bear interest at the rate of twelve percent (12%) per annum, simple interest (the **"Supplemental Return"**), from the date contributed until the date returned, payable from the Non-Paying Members proceeds under Section 5.7.

Section 4.4     <u>Capital Shortfall Loans</u>.  If neither the Class A Members nor the Class B Member are willing to cover the entire shortfall in required capital then, the Manager shall seek to borrow the additional required capital from one or more third-parties upon terms commercially available at the time the loan is obtained.  Such shall be referred to herein as a **"Capital Shortfall Loan."**  A Capital Shortfall Loan(s) may be secured by a deed of trust encumbering the Property.  Upon completion of the negotiation of the terms of the Capital Shortfall Loan(s), approval of the Capital Shortfall Loan(s) may be authorized by the Manager, so long as the aggregate principal amount of such loans does not exceed an amount equal to ten percent (10%) of the Original Principal Loan Amount.  For any Shortfall Loans that would result in the aggregate principal amount of such loans exceeding an amount equal to ten percent (10%) of the Original Principal Loan Amount, approval must be obtained from the Class A Members by Majority Vote.

Section 4.5     <u>Supplemental Interest and Costs</u>.  The costs of any Shortfall Loan, as well as the interest for any Supplemental Capital Contribution and/or Shortfall Loan shall be deemed "**Supplemental Interest and Costs**".

Section 4.6     <u>Capital Accounts</u>.  A Member's capital account (**"Capital Account"**) in the Company shall mean an account maintained for each Member in accordance with Regulations Section 1.704-1 (b) and 1.704-2 and to which the following provisions apply to the extent not inconsistent with such regulations:

        i.     There shall be credited to each Member's Capital Account: (i) such Member's Capital Contributions; (ii) such Member's distributive share of profits; (iii) any items of income or gain specially allocated to such Member under this Agreement; and (iv) the amount of any Company liabilities (determined as provided in Code Section 752 (c) and the regulations thereunder) assumed by such Member or to which property distributed to such Member is subject;

        ii.     There shall be debited to each Member's Capital Account (i) the amount of money and the Gross Asset Value of any property distributed to such Member pursuant

to this Agreement; (ii) such Member's distributive share of losses; (iii) any items of expense or loss which are specially allocated to such Member under this Agreement, and (iv) the amount of liabilities (determined as provided in Code Section 752 (c) and the Regulations thereunder) of such Member assumed by the Company (within the meaning of Code Section 704) or to which property contributed to the Company by such Member is subject; and

        iii.    The Capital Account of any transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's Membership Interest was obtained.

The initial Capital Accounts of the Members shall be as set forth on the signature page attached hereto.

        Section 4.7    <u>Manager's Modification of Capital Accounts</u>.  In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts or any increases or decreases (including, without limitation, increases or decreases relating to liabilities which are secured by contributed or distributed property of which are assumed by the Company or the Members) are computed to comply with Regulation 1.704-1(b), the Manager may make such modification.  Such modification may only be made providing that it is not likely to have a material effect on the amounts distributable to any Member upon dissolution of the Company.

        Section 4.8    <u>Return of Contributions</u>.  Each Member shall look solely to the assets of the Company for return of such Member's Capital Contribution, including Supplemental Capital Contributions, and if the assets of the Company are insufficient to return such contributions, such Member shall have no recourse against the Manager or any other Member for that purpose.  No Member may resign from the Company or withdraw any part of such contributions or receive any distribution of such contributions from the Company, except upon dissolution of the Company or as specifically provided by this Agreement.

        Section 4.9    <u>Conventions for Calculating Capital Contribution Returns</u>.  Given the number of Members of the Company and the likelihood that Member Capital Contribution and Supplemental Capital Contributions (collectively "**Contributions**") will be made at different times by different Members, the task of maintaining accurate records of each Contribution and its corresponding return could create significant costs and inefficiencies for the Company.  As a result, the following conventions will be used by the Company in calculating returns on all Member Contributions:

        i.    When accounting for Contributions made timely by Members, it will be deemed that each Contribution was received on the first day of the calendar quarter in which it was made;

        ii.    Should a Member fail to make a Contribution when it is due, but subsequently make the Contribution, it will be deemed that such late Contribution was received by the Company on the first day of the calendar quarter immediately following the quarter in which the Contribution was actually received.

        iii.    After the first day of each calendar quarter, the Company will reconcile the Contributions.  Upon that reconciliation, if there has been a net overpayment of

Capital due to Members making Supplemental Capital Contributions for non-paying Members, and the non-paying Members subsequently making some or all of their Additional Capital Contributions, the overpayment will be returned to the Members making Supplemental Capital Contributions, pro-rata.

## ARTICLE 5
## PROFITS AND LOSSES; DISTRIBUTIONS

Section 5.1    <u>Tax Status, Reports and Allocations</u>.

(a)    Notwithstanding any provision contained in this Agreement to the contrary, solely for federal income tax purposes, each of the Members hereby recognizes that the Company will be subject to all provisions of Subchapter K of the Code; provided however, that the filing of United States Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.

(b)    At the direction and selection of the Manager, the Manager shall hire an independent third party certified public accountant (the **"Accountant"**), to prepare all tax returns and statements, if any, that must be filed on behalf of the Company with any taxing authority and shall use reasonable efforts to cause the Accountant to timely file such returns or statements.  The Manager shall use reasonable efforts to cause the Accountant to provide completed annual proposed tax returns and reports to the Members for approval by the Members within sixty (60) days after the end of the fiscal year.

(c)    All items of income, gain, loss, deduction and credit shall be allocated among the Members in a manner such that if the Company were dissolved, its affairs wound up and its assets distributed to the Members in accordance with their respective Capital Account balances immediately after making such allocation, such liquidating distributions would, as nearly as possible, be equal to the distributions that would be made pursuant to Section 5.7 hereof.  For purposes of making allocations pursuant to this Section 5.1(c) prior to the dissolution of the Company, the assets held by the Company on any Valuation Date (as to which a disposition has not occurred as of such Valuation Date) shall be deemed to have a value equal to their basis for Capital Account purposes (or as previously adjusted for allocations pursuant to this Section 5.1(c) for any other Valuation Date); provided, however, that in the event of a distribution (that includes assets other than cash) the Capital Accounts shall be adjusted to reflect the net value of any property distributed in such distribution and the Capital Accounts shall be adjusted to reflect the manner in which unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) would be allocated among the Members if there were a taxable disposition of such property for the net value of such property on the distribution date.

(d)    Notwithstanding any provision set forth in this Section 5.1, no item of deduction or loss shall be allocated to a Member to the extent the allocation would cause a negative balance in such Member's Capital Account (after taking into account any allocations of loss and deduction reasonably expected to be made during such fiscal year to such Member and any distributions reasonably expected to be made during such fiscal year to the extent they exceed offsetting increases to such Member's Capital Account) that exceeds the amount that such Member

-13-

would be required to reimburse (and deemed required to reimburse) to the Company pursuant to this Agreement or under applicable law.  In the event some but not all of the Members would have such excess Capital Account deficits as a consequence of such an allocation of loss or deduction, the limitation set forth in this Section 5.1(d) shall be applied on a Member by Member basis so as to allocate the maximum permissible deduction or loss to each Member as reasonably determined by the Manager in its sole discretion.  All deductions and losses in excess of the limitations set forth in this Section 5.1(d) shall be allocated to the Manager.  In the event any loss or deduction shall be specially allocated to a Member pursuant to either of the two preceding sentences, an equal amount of income of the Company shall be specially allocated to such Member prior to any allocation pursuant to Section 5.1(c) hereof.

(e)    All elections, decisions and other matters concerning the allocation of profits, gains and losses among the Members, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Manager in its reasonable, good faith discretion with the advise and counsel of the Company Accountant.

(f)    The provisions of this Section 5.1 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations.  The Manager shall be authorized to make appropriate adjustments to the allocations of items pursuant to this Section 5.1 if necessary in order to comply with Section 704 of the Code or applicable Treasury Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

Section 5.2    <u>Certain Gross Asset Value/Tax Differences</u>.  In accordance with Section 704(c) of the Code and the applicable Regulations thereunder, income, gain, loss, deduction, and tax depreciation with respect to any property contributed to the capital of the Company, or with respect to any property which has a gross asset value different than its adjusted tax basis, shall, solely for income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted tax basis of such property to the Company and the gross asset value of such property.  The Manager, in the case of a revaluation, and the Manager and the Member or Members who contributed the asset creating the book-tax disparity have the sole discretion to choose among the alternatives set forth in the Regulations issued under Code Section 704(c) for handling a book-tax disparity with respect to any asset, and to the extent allowable under applicable Regulations, different methods may be used for specific assets.  In addition, if any gain (as computed for tax purposes) on the sale or other disposition of any Company Property shall constitute recapture of depreciation under Sections 291, 1245 or 1250 of the Code or any similar provision, such gain shall (to the extent possible) be divided among the Members in proportion to the depreciation deductions previously claimed by them (or their predecessor in interest) giving rise to such recapture; provided, however, that this sentence shall not affect the amount of gain otherwise allocable to a Member.

Any elections or other decision relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Agreement.

Section 5.3    <u>Minimum Gain and Income Offsets</u>.

(a)      Definitions.

(i)      **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a) Crediting to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b) Debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(ii)      **"Member Minimum Gain"** has the meaning set forth in Regulations Sections 1.704-2(d).

(iii)      **"Member Nonrecourse Debt"** has the meaning set forth in Regulations Section 1.704-2 (b) (4) as it applies to partners.

(iv)      **"Member Nonrecourse Debt Minimum Gain"** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

(v)      **"Member Nonrecourse Deductions"** means any Company deductions that would be nonrecourse deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulations Section 1.704-2(i).

(vi)      **"Company Minimum Gain"** has the same meaning as the term "minimum gain" as set forth in Regulations Sections 1.704-2(d) and 1.704-2(b) as such term applies to partnerships.

(vii)      **"Regulations"** means the Income Tax Regulations promulgated by the Treasury Department under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(b)      <u>Minimum Gain</u>.

(i)      <u>Minimum Gain Chargeback</u>. Notwithstanding any other provision of this Article 5, if there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member who would otherwise have an Adjusted Capital Account Deficit at the end of such year shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount and manner sufficient to

-15-

eliminate such Adjusted Capital Account Deficit as quickly as possible. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f).  This Section 5.3(b)(i) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(ii)     <u>Member Minimum Gain Chargeback</u>.  Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse debt, determined in accordance with Regulations Section 1.704-2(j)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.3(b)(ii) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustment, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(<u>4</u>), (<u>5</u>) or (<u>6</u>), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided, however, that any allocation pursuant to this Section 5.3(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 5 have been tentatively made as if this Section 5.3(c) were not in this Agreement.

(d)     <u>Deficit Capital Account</u>.  In the event any Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement; (ii) the amount such Member is, deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-2(g)(1) and Regulations Section 1.704-2(i)(5); and (iii) the amount such Member would be deemed obligated to restore if Member Loan Nonrecourse Deductions were treated as Nonrecourse Deductions, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided, however, that an allocation pursuant to this Section 5.3(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 5 have been made as if section 5.3(c) hereof and this Section 5.3(d) were not in the Agreement.

(e)     <u>Curative Allocations</u>.  The allocations set forth in Sections 5.1 and 5.5 hereof (the "**Regulatory Allocations**") are intended to comply with certain requirement of

Regulations Section 1.704-1(b). Notwithstanding any other provision of this Article 5 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses, and items of income, gains, loss, and deduction among the Members and shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. Notwithstanding the preceding sentence, Regulatory Allocations relating to (i) Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Company Minimum Gain; and (ii) member Nonrecourse Deductions shall not be taken into account except to the extent that there would have been a reduction in the Company Minimum Gain if the loan to which such deductions are attributable were not made or guaranteed by a Member within the meaning of Regulations Section 1.704-2(i).

Section 5.4    Net Cash from Operations and Net Capital Proceeds.

(a)    The **"Net Cash from Operations"** shall mean the gross cash proceeds from the Company's operations, which shall include the leasing or rental of portions of the Company Property, in the normal course of the Company's business, less the portion thereof used to pay, establish reserves for Carry Costs and other Company operating expenses, all as reasonably determined by the Manager.  The Net Cash from Operations shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances.

(b)    The **"Net Capital Proceeds"** shall mean the gross cash proceeds from the sale, exchange or other disposition of any Company Property, minus each of the following:  (i)any amounts necessary to payoff any Capital Shortfall Loan or other indebtedness encumbering all or any portion of the Property; (ii) normal and customary closing costs and commissions;  (iii) if the business of the Company shall be ongoing, reserves for Carry Costs  and other Company operating expenses, all as reasonably determined by the Manager; and (iv) all other costs associated with the subject sale, exchange or other disposition of Company Property, as reasonably approved by the Manager.

Section 5.5    Allocations.  Allocations shall be as follows:

(a)    Profits.   After giving effect to the special allocations below, profits for each fiscal year shall be allocated among the Members according to their then existing Membership Interest.

(b)    Losses.   After giving effect to the special allocations below, losses for the fiscal year, shall be allocated among the Members  according to their then existing Membership Interest.  Loss allocations, however, shall not exceed the maximum amount of losses that can be so allocated without causing any Member to have an adjusted capital account deficit at the end of any fiscal year.

(c)    General.

(i)    All items of income, gain, loss, deductions, and any other allocations not otherwise provided for shall be divided in the same proportions as they share profits and losses for the fiscal year.

(ii)    The Members are aware or should be aware after consulting with their tax counsel of the income tax consequences of this Article and agree to be bound by this Article when reporting their shares of income and loss of the Company for income tax purposes.

(d)    Special and Code Allocations.

(i)    Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i)(2).

(ii)    Code Section 704(c).  Income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among Members so as to take into account any variations by the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

Section 5.6    Tax Allocations: Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 2.11 hereof, subsequent allocations of income gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704 (c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 5.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, and Member's Capital Account or share of profits, losses, other items, or distributions pursuant to any provision of this Agreement.

Section 5.7    Distributions to Members.

(a)    Distributions, if any, to the Members of Net Cash From Operations or Net Capital Proceeds, shall be as follows:

(i)    First, as a return of all unreturned Supplemental Capital Contributions, together with all accrued interest thereon as provided in Section 4.3 above, to the Members, to the extent that they made such contributions until all unreturned Supplemental Capital Contributions (together with accrued interest) are returned to the Members in full; then

-18-

(ii)    Second, as a return of all unreturned Additional Member Contributions and Class B Member Initial Contributions, together with all accrued interest thereon as provided in Sections 4.1 and 4.2 above, to the Members, *pro rata,* in proportion to the amount then due to each Member, as applicable, until all unreturned Additional Member Contributions and Class B Member Initial Contributions (together with all accrued interest thereon) are returned in full to the Members; then

(iii)    Third, ninety percent (90%) to the Class A Members in proportion to their Membership Interests and ten percent (10%) to the Class B Member, until the Class A Members have received an amount equal to the Waterfall Increase Amount as defined below; then

(iv)    Fourth and thereafter, seventy percent (70%) to the Class A Members in proportion to their Membership Interests and thirty percent (30%) to the Class B Member.

The "**Waterfall Increase Amount**" is an amount equal to the Class A Members Initial Contribution plus one percent (1%) of the Class A Members Initial Contribution per annum from the Effective Date of this Agreement until the date of the sale of the Property, prorated monthly. By way of example only, assuming (i) the Class A Members Initial Contribution was $1,000,000, and (ii) the Property sold 3 years and 3 months from the Effective Date of this Agreement, the Waterfall Increase Amount would increase by 3.25%. Therefore, in this example, the split between the Class A Members and the Class B Member would go from 90/10 to 70/30 once the Class A Members had received under Sub-Section (iii) the amount of $1,032,500.

Such distribution of Net Capital Proceeds shall be made to the Members no more than ten (10) days after the sale or other transaction from which the proceeds resulted. If a distribution of Net Capital Proceeds results from a sale or other disposition of only a portion of the Property, then, after fulfillment of Subsections (i) and (ii) above, the distribution pursuant to Subsections (iii) and (iv) above (as well as the Waterfall Increase Amount) shall be prorated based on the percentage by which the acreage of the portion of the Property sold bears to the total acreage of the Property (e.g., if only 30% of the Property is sold, then the net proceeds will first go to unreturned Supplemental Capital Contributions, together with all accrued interest thereon, then to unreturned Additional Member Contributions, together with all accrued interest thereon. If net proceeds remain, distributions would be 90% to the Class A Members in proportion to their Membership Interests and 10% to the Class B Member, until each Class A Member has received 30% the value of its entire Initial Contribution, and then on a 70/30 basis pursuant to Sub-Section (iv) thereafter.

(b)    Allocation of Supplemental Interest and Costs. The Manager shall appropriately allocate the Supplemental Interest and Costs (as defined in Section 4.5 above) only between the Paying and Non-Paying Class A Members such that:

(i)    In the event of Supplemental Capital Contributions, the Paying Members receive the return of any such Supplemental Capital Contribution paid on behalf of Non-Paying Members, as well as Supplemental Interest thereon, and the cost of repaying any such Supplemental Capital Contribution and Supplemental Interest thereon is borne by the Non-Paying Members in the correct proportions; and

-19-

(ii)    In the event of Capital Shortfall Loans, the Supplemental Interest and Costs created by the Capital Shortfall Loans is borne by the Non-Paying Members in the correct proportions so that the distribution to the Paying Members is equal to the amount the Paying Members would have received had the Non-Paying Members contributed their full Capital Contributions so that no Capital Shortfall Loans would have been necessary.

Supplemental Interest and Costs shall be excluded from the calculation used to determine the distribution amounts to the Class B Member under Sections 5.7(a)(iii) and (iv).

(c)    Non-Cash distributions.  Non-cash assets, if any, shall be distributed in a manner that reflects how cash proceeds from the sale of such assets for fair market value would have been distributed (i.e. after any unrealized gain or loss attributable to such non-cash assets has been allocated among the Members in accordance with this Section, as if such assets had been sold in a taxable transaction for fair market value).

Section 5.8    Adjustments Among Paying and Non-Paying Members.  Any Class A Member that fails to timely make a required Additional Capital Contribution is referred to herein as a "**Non-Paying Member**."  The distribution of Net Capital Proceeds among the Class A Members pursuant to Section 5.7 above shall be adjusted such that all interest and other expense payable with respect to any Supplemental Capital Contribution and/or any Capital Shortfall Loan shall be borne solely by the Non-Paying Members on a pro-rata basis in proportion to their respective shortfalls in required contributions.  A Non-Paying Class A Member shall remain designated as a Non-Paying Member until such time as such Member pays any outstanding Additional Member Contribution with all Supplemental Interest and Costs.

Section 5.9    Changes in Membership Interests.  If a Member's Membership Interest changes during any fiscal year, the allocations to be made pursuant to this Agreement shall be made in accordance with Section 706 of the Code, using any convention permitted by Section 706 of the Code and the Regulations promulgated thereunder and selected by the Manager so as to equitably effectuate the allocations of this Article.

Section 5.10    Persons Entitled to Distributions.  Distributions shall be made only to Members of record and transferees of Economic Interests recognized by the Company pursuant to Article 8 of this Agreement (without regard to any Transfer of a Membership Interest or Economic Interest not so recognized, whether or not the Company or any Member or the Managing Member has knowledge or notice of such Transfer).

## ARTICLE 6
## ACCOUNTING, RECORDS AND REPORTS

Section 6.1    Fiscal Year.  The Company's fiscal year shall be the calendar year, from January 1 to December 31.

Section 6.2    Accounting.  The Manager shall cause to be prepared, all required Company reports and returns, including quarterly and annual reports and returns.

Section 6.3    Company Books.  The Manager shall cause detailed, complete and accurate records of all financial and business transactions of the Company to be maintained, and shall keep proper and complete books of account, in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by persons engaged in businesses of a like character.  The books and records shall at all times be maintained at the principal place of business of the Company.  Copies of all books and records of the Company shall be provided to and held by the Manager at all times and shall be open to the inspection and examination of the Members or their duly authorized representatives.

In addition, the Manager will maintain a written log with copies of all Unit Certificate, the name and address of each Unit holder, including the history of any Unit transfers and the name and address of any New Member.

Section 6.4    Reports to Members.  As soon as is practicable in the particular case, the Manager shall, upon request, but no less than annually, cause the Company Accountant to deliver to each Member:

(a)    Such information concerning the Company as shall be necessary for the preparation by such Member of its income or other tax returns;

(b)    The Company's federal income tax return for that year;

(c)    Such other information as may be requested by the Manager or by any Member or as shall be reasonably necessary for the other Members to be advised of the results of the operations of the Company.

Section 6.5    Capital Accounts.  The Company Accountant shall maintain records of all required Capital Accounts and provide all required capital accounting for the Company, the Manager and the Members.

Section 6.6    Bank Accounts.  Funds of the Company shall be deposited in a Company account or accounts in such financial institutions (including any state or federally chartered bank or savings and loan association) as selected by the Manager, taking into consideration the financial stability of the financial institution and the availability of FDIC insurance coverage for the Company funds to be deposited.  Withdrawals from such bank accounts shall be made only by the Manager.

Section 6.7    Title to Property.  Title to the Company Property shall be held in the name of the Company.

## ARTICLE 7
## BUSINESS OPERATIONS AND MANAGEMENT

Section 7.1    Management.  Except for the voting and approval rights of the Steering Committee and the Class A Members set forth in this Article 7 and elsewhere in this Agreement, and except for those matters delegated to the Class B Member pursuant to Section 7.9, the Manager shall have the exclusive control of the management of the business and affairs of the

Company, responsibility for the supervision, management, control and implementation of the day-to-day business of the Company in accordance with the Business Plan and the Project Budget.

Section 7.2    Manager.    [Clayton management entity]    is hereby appointed the Manager of the Company.  In all events, Manager shall perform Manager's duties under this Agreement in good faith, in a manner that Manager reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

Section 7.3    Steering Committee.

(a)    Initial Appointment; Election of Committee Members.    A Steering Committee shall be formed to assist Manager in the management of the Company as set forth in this Agreement.  The Steering Committee shall be comprised of five (5) individuals.  Four (4) of the Steering Committee members shall be elected by the Class A Members, each of whom must be a Class A Member (or the trustee of a trust or the designated employee of an entity which is a Class A Member).  The remaining one (1) Steering Committee member shall be appointed by the Manager and need not be a Class A Member.  The initial appointees of the Class A Members to the Steering Committee are listed on Exhibit "F" attached hereto.  The Steering Committee members shall serve a two (2) year term.  Every two (2) years following the date hereof, the Class A Members shall vote to elect the four (4) Steering Committee members to be elected by the Class A Members to serve for the ensuing two years.  Those individuals receiving the highest number of votes entitled to be voted for them, up to the number of Steering Committee members to be elected, shall be elected; provided, however, that only those Class A Members who are Paying Members as of the date of the election shall be entitled to vote for Steering Committee members.  If the Class A Members fail to elect new Steering Committee members then the current members previously appointed shall continue to serve until they are replaced.  If at any time there are not at least four (4) Class A Members who wish to serve on the Steering Committee, the number of Steering Committee members may be reduced but in all events the Steering Committee, including the member appointed by the Manager, shall constitute an odd number.

(b)    Nomination of Steering Committee Members.  Except with respect to the Steering Committee Member to be appointed by the Manager, nominations for election to the Steering Committee by the Class A Members shall be made pursuant to this Section 7.3(b).  Not less than 60 days prior to the date scheduled by the Manager for the election by the Class A Members, the Manager shall give written notice to the Class A Members, which notice may be sent by e-mail or standard mail to the last known e-mail or mailing address of each Class A Member, requesting nominations of Class A Members to serve on the Steering Committee, which shall include a notification of the Class A Member's eligibility to serve as a Steering Committee member.  Any Class A Member who is then a Paying Member and who submits a resume with a letter of interest to be a candidate and submits it to the Manager within 30 days after the notice has been sent, shall be placed on the written ballot which shall be mailed to all Class A Members listing all of the candidates to the Steering Committee.  In addition, each Class A Member shall receive a summary of each candidate's resume and letter of interest as submitted by the candidate to the Manager.  Each person whose name is placed on the ballot as a candidate to the Steering Committee must make a good faith effort to disclose any financial, business, professional or personal relationship or interest that would result or would appear to a reasonable person to result

-22-

in a potential conflict of interest if the candidate were to be elected to serve as a Steering Committee member.  The candidate must make the disclosure, in writing, with the candidate's resume and letter of interest to be a candidate, to be distributed to each Class A Member.  Write-in votes shall be considered void. Nominations will not be accepted from the floor.

(c)    <u>Vacancy of Steering Committee Members Elected by Class A Members.</u>  In the event of a vacancy on the Steering Committee resulting from the death, incapacity or resignation of a member elected by the Class A Members, the Manager shall give notice of the vacancy, request nominations and call for the election of a replacement to the Steering Committee by the Class A Members substantially in accordance with the provisions of Section 7.3(b) above for the election of a new Steering Committee member to fill the resulting vacancy.

(d)    <u>Vote</u>.  Each member of the Steering Committee shall have one (1) vote on all committee decisions, with equal voting power; <u>provided, however</u>, that no Class A Member elected to the Steering Committee may cast any vote during any period of time in which the Class A Member is a not a Paying Member.  Voting by the members of the Steering Committee on all Decisions may be conducted through voice vote (if at a meeting) or by written ballot, as determined by the Manager or  the Manager may elect to conduct the vote through a written consent of the members of the Steering Committee.

(e)    <u>Powers and Duties</u>.  Subject to the terms and conditions of this Agreement, the general duties of the Steering Committee shall be: (i) the approval of the annual Project Budget of the Company and any amendments or modifications thereto which necessitate any supplemental capital requests; and (ii) the approval of the annual Business Plan of the Company and any material amendments or modifications thereto.  Subject to Section 3.4, the Steering Committee shall have full power and authority, without obtaining the consent or approval of any Member, to take or refrain from such actions, and to make all Decisions in the manner that Steering Committee, in its sole discretion and good faith business judgment, deems appropriate.  The attendance of the Manager shall be required all meetings of the Steering Committee and, as necessary, the Steering Committee shall cause the Manager to document its decisions for the reliance of third-parties by the execution of resolutions.  Such resolutions shall be binding upon the Company upon the execution thereof by no less than three (3) members of the Steering Committee.

Section 7.4    <u>Delivery of Annual Reports</u>.  Manager shall annually (or more frequently as Manager may elect), provide to the Class A Members an update on the Property, any maintenance or predevelopment activities on the Property, information from the Class B Member regarding the status of the Class B Member Obligations (if applicable), and any activity with regard to the potential sale of the Property, together with a copy of the Business Plan and Project Budget for the Company as most approved by the Steering Committee.

Section 7.5    <u>Company Budget</u>.

(a)    On an annual basis, the Manager shall prepare and provide to the Class A Members an updated Project Budget for the Company prepared in consultation with the Class B Member, and as approved by the Steering Committee.  The Project Budget shall include estimates of the Carry Costs for the ensuing year, a reasonable amount to be held for reserves and such additional amounts as Manager considers appropriate for the required engagement of third parties,

such as outside consultants, engineers, architect, planners or attorneys. The Project Budget shall be the basis for the Additional Member Contributions required for that year.

(b) Manager will quarterly review the Project Budget to determine the adequacy of the remaining Company funds and to determine whether any funding shortfalls exist. Manager may, at its discretion, reallocate expenses among the line items of the Project Budget based on the actual expenses incurred to-date and/or based on anticipated future expenses. The Project Budget will also contain a contingency line, which shall be used by Manager to fund expenses that arise that (i) were unforeseen at the time the Project Budget was created and (ii) are minor in nature, which constitute immaterial expenses based on normal accounting practices.

(c) As the year progresses, if Manager determines that additional funds are required, Manager shall prepare an amended Project Budget for Steering Committee Approval, and following such approval Manager shall cause a capital call to be sent to the Class A Members for such additional funds. In no event will the Manager be required to expend any such third party expenses on behalf of the Company.

Section 7.6    <u>Management Fee</u>. For the services rendered hereunder, the Manager shall be paid an annual fee equal to _____[0.5% of the original Note amount]_____ Dollars ($_____).    Said fee shall be paid in quarterly installments, except that those management fees that are paid through the Upfront Payment shall be paid to Manager in one lump sum payment promptly following the payment by the Class B Member of the Upfront Payment.

Section 7.7    <u>Compensation and Fees</u>. Except as expressly set forth herein, the Manager, any Steering Committee member and/or any Member shall not be entitled to receive any compensation from the Company for its services rendered pursuant to this Agreement, nor, except as expressly set forth herein, shall it be entitled to receive any reimbursement for its expenditures, including without limitations, office overhead, travel and entertainment expenses, made in the course of its duties under this Agreement.

Section 7.8    <u>Time Devoted to Business; Independent Activities</u>. The Manager shall not be required to devote full time to the Company, but shall devote only such time to its duties on behalf of the Company as shall be reasonably necessary to perform or delegate such duties as contemplated hereunder. Any Member, including but not limited to the Manager, may have an interest, directly or indirectly, in various other businesses and undertakings not included in the Company. Neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager or any Affiliate of such parties from engaging in whatever activities the Member, Manager or Affiliate thereof chooses, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member, Manager or Affiliate thereof to permit the Company or any other Member, Manager or Affiliate thereof to participate in any such activities. As a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives and relinquishes any such right or claim of participation.

Section 7.9    <u>Limits on Powers</u>.  The Manager shall cause the Company to conduct its business separate and apart from that of any Member, of Manager, or of Affiliate thereof, including, without limitation:

(a)    segregating Company Property and not allowing the Company's funds or other property to be commingled with the funds or other assets of, held by, or registered in the name of any Member or Manager, or Affiliate thereof or of any other person;

(b)    causing the books, tax returns, and financial records of the Company to be maintained separate from the books and financial records of any Member or Manager, or Affiliate thereof or of any other person;

(c)    observing all Company procedures and formalities (including, without limitation, maintaining minutes of meetings and acting on behalf of the Company only pursuant to due authorization of the Class A Members); and

(d)    causing the Company to conduct its dealings with third parties in the Company's name as a separate and independent entity.

In addition, no Manager or Member may, and shall not cause the Company to:

(i)    Do any act in contravention of this Agreement;

(ii)    Possess Company Property or assign the rights of the Company in any Company Property for other than a Company purpose;

(iii)    Commingle the Company's assets with those of any other person;

(iv)    Use or permit another person to use the Company's assets in any manner, except for the exclusive benefit of the Company;

(v)    Make loans to Manager, any Member or any Affiliate of any Member; or

(vi)    Hold the assets of the Company, whether real or personal, to be held in a name other than the name of the Company.

Section 7.10    <u>Class B Member Obligations</u>.  The Class B Member shall fulfill the following obligations in accordance with and subject to the Business Plan and the Project Budget:

(a)    At least annually (and not later than October 1 of each fiscal year), and more frequently upon the request of Manager, provide to the Manager a proposed operational budget for the Property for the next fiscal year detailing the for the expenses of the Property;

(b)    At least annually (and not later than October 1 of each fiscal year), and more frequently upon the request of Manager, provide to the Manager input regarding the Class B Member's proposed modifications on the Business Plan for the upcoming fiscal year, including but not limited to an anticipated schedule for any critical milestones that are reasonably anticipated to

occur within the upcoming fiscal year and information regarding any Work that may be required to be undertaken and/or performed by the Class B Member during the upcoming fiscal year to reasonably preserve and/or enhance the value of the Property;

(c)    At least quarterly, provide periodic status reports to the Manager regarding the Class B Member Obligations;

(d)    Use its best efforts to maintain the Property in good condition and repair, in compliance with all applicable laws, rules, permits, regulations, zoning conditions, entitlements, and/or approvals and orders, and promptly undertake the cure of any violations thereof, all at the expense of the Company but subject however to the budgetary limitations in the Project Budget and further subject to the prior consent of the Manager;

(e)    To the extent identified in the Business Plan, use its best efforts to diligently commence, supervise, monitor and complete the Work to be performed by the Class B Member in accordance with the Business Plan, at the expense of the Company but subject however to the budgetary limitations in the Project Budget and further subject to the prior consent of the Manager;

(f)    If the Property includes Water Rights, make such filings and use its best efforts to undertake such actions as may be required to continue to prove and establish the beneficial use of the Water Rights and otherwise preserve and enhance the value of the Water Rights, at the expense of the Company but subject however to the budgetary limitations in the Project Budget;

(g)    Give prompt written notice to Manager of the existence of any Work that is not identified in the Business Plan; and

(h)    Attend all meetings of the Steering Committee and of the Members when requested to do so by Manager.

In all events, the Class B Member Obligations (including without limitation, the Work, if any) shall be performed with the active and direct involvement by John A. Ritter.  Subject only to his unavailability due to death, disability or illness, should John A. Ritter voluntarily abandon direct involvement in the performance of the Class B Member Obligations then, after written notice by the Manager and a reasonable opportunity to cure, the Company shall be entitled to declare the Class B Member to be in default of its obligations hereunder in which case the Company shall have the right to terminate the Class B Member's interest hereunder by written notice.  Upon any termination of the Class B Member's interest hereunder by the Company, neither the Class B Member nor John A. Ritter shall any further rights, obligations, or responsibilities hereunder.

Section 7.11    <u>Limited Role of Members</u>.  Except as otherwise expressly provided in this Agreement or as provided by the non-waivable provisions or NRS Chapter 86, no Member shall take part in, or interfere with, the management or conduct of the Company's business.  No Member shall, without the prior approval of the Manager, endorse any note or act as an accommodation party, or otherwise become surety for any person in any transaction that may involve the Company.  Notwithstanding the foregoing, any Member may solicit offers on the Property and convey any such offers received to the Manager.

Section 7.12    <u>Transactions With Interested Parties</u>.  The Company may only enter into a business transaction in which the Manager, a Member or any Affiliate the Manager, or a Member has a personal interest, whether directly or indirectly, if the following conditions are satisfied:

(a)    The transaction is an arms-length transaction entered into in good faith by all parties; and

(b)    The Company is benefitted by the transaction and the transaction is made on commercially reasonable terms and conditions.

Section 7.13    <u>Real Estate Brokerage Commissions</u>.  Subject to the terms of Section 7.11, the Manager, on behalf of the Company, may, but shall not be required to, use the services of Focus Commercial Group, Inc., or its successor or assignee ("**Focus Broker**"), for the marketing and sale of the Property, and if Manager so elects, upon the sale of the Property (or any portion thereof), the Company shall pay from the proceeds of such sale a real estate brokerage commission based on an industry standard real estate brokerage commission percentage approved in advance by the Manager. The Members acknowledge that the Focus Broker is an affiliate of the Class B Member.  In the event that Manager on behalf of the Company does not enter into or thereafter the Company does not remain subject to an exclusive real estate brokerage agreement with the Focus Broker, then the Focus Broker shall nevertheless retain a non-exclusive right to market the Property as part of a proposed master plan development or other property assemblage, and if the Focus Broker is the procuring cause of the sale of the Property, then the Focus Broker will be paid an industry standard commission at the closing by the Company; provided however, that the sale must be approved by the Manager and the commission to be paid to the Focus Broker shall be a part of the commissions to be paid by the Company to the Company's listing broker (if any) and other participating brokers (if any) based on industry standards.

**ARTICLE 8**
**TRANSFERS OF MEMBERSHIP INTERESTS**

Section 8.1    <u>Restrictions</u>.

This Article 8 shall apply to all transfers of a Membership Interest (now owned or hereafter acquired) by a Member, whether voluntary, involuntary, by operation of law, or resulting from death, disability or otherwise, and shall include assignment, encumbrance, pledge, disposal, sale, exchange, delivery, hypothecation and transfer (all referred to as "**Transfer**").  Without limiting the foregoing, a Transfer shall include an involuntary lifetime transfer by entry of a final order of a court in a divorce proceeding directing transfer of a Membership Interest or any transfer occasioned by a separation agreement in a divorce proceeding.

Subject only to Section 8.2(d) below, any Member may sell all or part of such Member's Interest to any Class A Member.

Without the express approval of the Manager in each instance, neither the Class B Member nor any Affiliate of the Class B Member shall be permitted to acquire the Membership Interest of any Class A Member unless the entire Membership Interests of all of the Company's Class A Members are simultaneously acquired by the Class B Member and/or its Affiliate.

Section 8.2    Sale to a Non-Member.

(a)    Any Member who desires to sell a Membership Interest ("**Selling Member**") to any person or entity who is not a Class A Member prior to the sale, must first offer in writing to sell the entire interest in the Company to the Paying Class A Members, outlining the price and terms under which the Selling Member would sell its Membership Interest. The Manager shall be responsible for disseminating the offer to the Members.

(b)    The Paying Class A Members shall have the right to buy the Selling Member's Membership Interest for a period of thirty (30) days after the Selling Member has made the Selling Member's offer. The Paying Class A Members desiring to purchase the Interest, may do so in such proportion mutually agreed to between the Members choosing to purchase an Interest. In the event that the Members choosing to purchase an Interest can not mutually agree, such purchases shall be in a proportionate amount calculated by the Membership Interest of each such Member divided by the total Membership Interests of all Members choosing to purchase an interest.

(c)    If the Paying Class A Members do not chose to purchase all of the Selling Member's interest within the 30 day period, subject to Section 8.6 below, the Selling Member shall have the right for another 90 days to sell the remaining unsold share to any bona fide offeror for the same or higher price and on the same terms and conditions as had been offered to the Members.

(d)    Notwithstanding the foregoing, a Selling Member may only Transfer all or part of such Member's Interest if (a) the Selling Member is a Paying Member as of the date of the Transfer, or (b) upon the consummation of the Transfer, the all necessary payments are made so that the new Member is deemed a Paying Member upon acquisition of the Membership Interest.

Section 8.3    Transferees; Charging Orders.

(a)    Any assignee or other transferee of a Member's Membership Interest, or any portion thereof, who is not admitted as a Member pursuant to this Article 8 shall only have, as its sole rights, the right to receive allocations and distributions with respect to thereto in accordance with this Agreement and to receive a K1 that reflects such person's share thereof ("**Economic Interest**"). In addition, no such person shall have the right to any information concerning, or an accounting of, the affairs of the Company, be entitled to inspect the books or records of the Company, or have any of the rights of a Member that are provided in this Agreement or under the NRS.

(b)    Additionally, no such person may (i) cause a dissolution of the Company; or (ii) compel the Company, the Manager, or any Member to make a distribution, or otherwise cause a distribution to be made.

(c)    The sole and exclusive remedy of any creditor or other third party against any Member with respect to such Member's Membership Interest shall be the right to seek and obtain a charge by a court of competent jurisdiction (a "**Charging Order**"), as prescribed in NRS § 86.401 or any successor provision of the NRS, against such Member's Membership Interest. Upon successfully obtaining a Charging Order, a creditor or other third party shall only be entitled to the Economic Interest of such Membership Interest. No creditor or other third party, whether or

not a Charging Order exists, shall have any right or remedy of foreclosure or to otherwise sell or force a sale of any portion of the Economic Interest of any charged Membership Interest without the approval of the Manager, nor shall any such person have any right or remedy to access Company Property whatsoever or to otherwise force or request a distribution of property from the Company.

Section 8.4    <u>Distributions and Allocations with respect to Transferred Membership Interest</u>.  If any Membership Interest is transferred during any fiscal year, profits, losses, and each item thereof, and all other items attributable thereto for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during such Fiscal year in accordance with Code Section 706(d), using any convention permitted by law and selected by the Manager in its reasonable determination.  All distributions, including, without limitation, Net Capital Proceeds, on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall only recognize such Transfer on the first day of the calendar month following the month in which it receives notice thereof; provided, however, that, if the Company does not receive a notice that contains such other information as the Manager may reasonably require to properly effectuate such Transfer within thirty (30) days after any request by the Company therefor, then all items shall be allocated, and all distributions shall be made, to the transferor of such Interest so long as such transferor's economic rights have been recognized by the Company.  Neither the Company, the Manager, nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section, whether or not a Manager, a Member, or the Company has actual knowledge of any such Transfer.

Section 8.5    <u>Taxpayer Information</u>.  Notwithstanding anything to the contrary contained in this Article, the transferor and transferee shall be responsible, jointly and severally, to furnish the Company with the taxpayer identification number of the transferee of any Membership Interest that is recognized by the Company or required to be recognized by applicable law; sufficient information to determine the transferee's initial tax basis in the Membership Interest that is to be transferred; and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information.  Without limiting the generality of the foregoing, the Company shall not be required to make any distribution whatsoever pursuant to this Agreement with respect to any such Interest until it has received such information.

Section 8.6    <u>Admission of Additional Members</u>.

(a)    No additional member may be admitted to the Company without the advance written consent of the Manager.  Such approval by the Manager may specify the terms and conditions under which the Transfer may occur and whether the transferee will become a Member.  If the Transfer is approved but the transferee is not approved as a Member, or if the Transfer is required by operation of law or court order, then the transferee shall hold only an Economic Interest.   Manager shall not unreasonably withhold or delay providing consent for the Transfer.  Manager will only deny a request for Transfer if, in the Manager's good faith opinion, Manager believes that the Transfer would not be in the best interest of the Company.  In addition to general business considerations for such a decision, Manager may also determine that the Transfer would

not be in the best interest of the Company if such Transfer may violate state or federal securities laws, or could cause the Company to become a "Reporting Company" under securities laws.

(b)    Any and all such additional Members shall promptly execute, acknowledge (if required), and deliver such documents as the Manager may require, including, without limitation, this Agreement or a supplement hereto whereby said new Member binds himself to the terms and conditions hereof.

(c)    Unless the Manager approves otherwise, the transferee of Units shall reimburse the Company for all reasonable accounting, legal and other expenses incurred by the Company in connection with the Transfer of Units to such transferee.

Section 8.7    Revocable Trust and Other Estate Planning Entities.    Notwithstanding Section 8.6, a Member may elect to assign all of the Member's Membership Interest to a family or separate property revocable trust, partnership, limited liability company or to a corporation wholly owned by the Member for estate planning purposes, or convey the Member's interest through any estate vehicle or law upon such Member's death.  The conveyance shall not be deemed a sale since the Members recognize that individuals frequently arrange their holdings for estate planning purposes.  However, application for the conveyance and proof of conveyance shall be made to the Manager and, unless the Manager approves otherwise, the assigning Member shall reimburse the Company for all reasonable accounting, legal and other expenses incurred by the Company in connection with such assignment and/or conveyance.    Thereafter, Manager shall cause the membership records to be changed to show the new vesting of membership.

Section 8.8    Restrictive Legend.  In addition to any other restrictive legend that may be imposed on any certificate evidencing ownership of any Units, such certificate shall bear the following legend:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE
SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH
IN THE OPERATING AGREEMENT OF THE COMPANY.

## ARTICLE 9
## TERM AND TERMINATION

Section 9.1    Duration.  The Company shall be perpetual and shall terminate and dissolve only as provided in the Article.

Section 9.2    Dissolution of Company.  The Company shall be terminated and dissolved only upon the occurrence of any of the following events:

(a)    Majority Approval of the Class A Members and the affirmative vote of the Class B Member to dissolve the Company; or

(b)    the sale of all of the assets of the Company; or

(c)    the entry of a dissolution decree or judicial order by a court of competent jurisdiction or by operation of law; or

(d)    the occurrence of an event requiring dissolution of the Company under the Act.

Section 9.3    <u>Winding up of the Company</u>.  On dissolution and termination of the Company under this Agreement or applicable law, except as otherwise provided in this Agreement, the continuing operation of the Company's business shall be confined to those activities reasonably necessary to wind up the Company's affairs, discharge its obligations, and either liquidate the Company's assets and deliver the proceeds of liquidation, or preserve and distribute its assets in kind promptly on dissolution.

Section 9.4    <u>Termination of Company</u>.

(a)    Upon dissolution of the Company, the Company shall be terminated as rapidly as business circumstances will permit.  The Manager shall cause a full accounting of the assets and liabilities of the Company to be taken and a statement of the Company assets and a statement of each Member's Capital Account to be furnished to all Members as soon as is reasonably practicable.  The Manager shall take such action as is necessary so that the Company's business shall be terminated, its liabilities discharged and its assets distributed as hereinafter described, and shall be subject to and act in accordance with the provisions of this Agreement.  A reasonable period of time shall be allowed for the orderly termination of the Company to minimize the normal losses of a liquidation process.

(b)    After the payment of all expenses of liquidation and of all debts and liabilities of the Company in such order or priority as provided by law (including any debts or liabilities to Members, who shall be treated as secured or unsecured creditors, as may be the case, to the extent permitted by law, for sum loaned to the Company, if any, as distinguished from Capital Contributions) and after all resulting items of Company income, gain, credit, loss or deduction are credited or debited to the Capital Accounts of the Members in accordance with Articles 4 and 5 hereof, all remaining Company assets shall then be distributed among the Members in accordance with and pursuant to Section 5.7 hereof.  Upon termination, a Member may not demand and receive cash in return for such Member's Capital Contributions and no Member shall have any obligation to restore any deficit that may then exist in the Member's Capital Account.

**ARTICLE 10**
**REPRESENTATIONS AND WARRANTIES**

Section 10.1    <u>Representations and Warranties</u>.  Each person or entity admitted as a Member represents and warrants to the Company and to all of the other Members the matters set forth below.

(a)    <u>Prior Ownership of Percentage in Note</u>.  Immediately prior to the Effective Date of this Agreement, such Member owned the beneficial interest in the Note in the percentage set forth in <u>Exhibit "C"</u>.

(b)    <u>Interests not Registered</u>.  The Company has advised such Member: (i) that the Membership Interests have not been registered under the Securities Act, as the offering and sale of such Membership Interests was effected in accordance with an exemption from the registration

requirements of the Securities Act and similar exemptions under applicable state securities laws, and (ii) that, in this connection, the Company is relying, in part, on the representations and warranties of each Member set forth herein.

(c)    <u>Exemption from Registration Required upon Disposition</u>.  Without limiting any other restrictions on the Transfer of a Membership Interest contained in this Agreement, no Member shall make a Transfer of all or any portion of such Member's Membership Interest unless and until: (i) such Member has notified the Company of the proposed disposition; (ii) if requested by the Manager, such Member has furnished the Company with an opinion of legal counsel to the effect that such Transfer shall not require registration of such Member's Membership Interest under the Securities Act; (iii) such opinion of legal counsel has been concurred with by the Company's legal counsel; and (iv) the Company has advised such Member of such concurrence.

(d)    <u>Acknowledgment of Receipt of Information</u>.  Such Member has received all information as such Member deems necessary and appropriate to enable such Member to evaluate the financial risk inherent in acquiring such Member's Membership Interest, and such Member acknowledges receipt of satisfactory and complete information covering the business and financial condition of the Company in response to all inquiries in respect thereof.

(e)    <u>Independent Advice</u>.  Such Member has had the opportunity to consult with such Member's investment counselors, attorneys, accountants and other advisors regarding the terms and conditions of this Agreement and the tax and legal consequences thereof.  Such Member has made its own independent evaluation of its investment in the Company and has not relied on the Company, any other Member or any of their Affiliates, accountants, counsel or other representatives in connection with such Member's investment in the Company.  Such Member understands that neither the Company nor any other Member nor any of their Affiliates, accountants, counsel or other representatives is acting as such Member's broker or advisor in connection with such Member's investment in the Company.  Such Member is relying solely upon its own advisers and not upon the Company, any other Member  or any of their Affiliates, accountants, counsel or other representatives to evaluate an investment in the Company and/or with respect to tax or other economic considerations of such Member relating to this investment.

(f)    <u>Risks</u>.  Such Member understands that such Member's investment in the Company is speculative and risky, and such Member has no assurance that the Company will be a financial success or that such Member's investment in the Company will be recovered.

(g)    <u>No Representations or Warranties</u>.  Neither the Company, nor any of the Members or Manager, nor any employee, agent or Affiliate of the Company or of any of the Members or Manager has made any representation or warranty to such Member not contained in this Agreement.

(h)    <u>No General Solicitation</u>.  The Company used no general solicitation or general advertising in connection with the Company's offer to sell (if any) or the Company's sale of such Member's Membership Interests to such Member.

(i)    <u>Absence of Registration</u>.  Such Member recognizes that: (i) such Member's Membership Interest have not been registered under the Securities Act and must be held

indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (ii) the Company is under no obligation to register such Member's Membership Interest under the Securities Act or to comply with any exemption from such registration; (iii) Rule 144 under the Securities Act presently does not apply and may never apply to the Company because the Company does not now, and may never, file reports required by the Exchange Act, and has not made, and may never make, publicly available the information required by Rule 15c2-l 1 of the Exchange Act; (iv) that if Rule 144 were available, sales of Company securities made in reliance thereon could be made only in certain limited amounts, after certain holding periods, and only when specified current information about the Company had been made available to the public, all in accordance with the terms and in satisfaction of the conditions of Rule 144; and (v) that, in the case of Company securities to which Rule 144 is not applicable, compliance with some other exemption under the Securities Act will be required in order for any re-sale or other Transfer of such Company securities to be effected legally.

(j)     No Distribution.   Such Member has not and will not distribute this Agreement or the Information to anyone other than its professional advisers or to the extent necessary to enforce any of the Member's rights under this Agreement.

(k)     Information True, Correct and Complete; Continuing Representations and Warranties.  All information or documents furnished or to be furnished by such Member or its representatives or professionals to the Company, including without limitation, the representations and warranties made by such Member in this Article (such information, documents, representations and warranties being referred to herein as the "**Member Information**"), are true, correct and complete in all material respects as of the date of this Agreement.  Such Member shall inform the Manager as soon as reasonably practicable if at any time any of such Member's Member Information ceases to be true, correct and complete in any material respect.  Such Member understands and agrees that the Manager, the Members and the Company will rely on (i) such Member's covenant to immediately inform the Manager if any of such Member's Member Information ceases to be true, correct and complete in all respects and (ii) the continuing accuracy of such Member's Member Information without re-confirming or re-certifying such accuracy with such Member.

(l)     No Withholding.   Such Member is entitled to receive any payments and distributions to be made to such Member under this Agreement without the withholding of any tax.

(m)     ERISA.   Except as otherwise disclosed to the Company and the Members in writing, such Member is not receiving the Membership Interests for or on behalf of one or more "employee benefit plans" subject to ERISA, "plans" subject to Section 4975 of the Code or any entity whose assets are deemed to be assets of such an "employee benefit plan" or "plan" for purposes of ERISA or the Code.

(n)     No Broker.   No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated hereby.

Section 10.2   <u>Restrictive Legend</u>.  In addition to any other restrictive legend that may be imposed on any certificate evidencing ownership of Units, each certificate evidencing Units shall bear the following legend:

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. NO SUCH SECURITY NOR ANY INTEREST OR PARTICIPATION THEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.

## ARTICLE 11
## MISCELLANEOUS

Section 11.1   <u>Governing Law</u>.  This Agreement is intended to be performed in the State of Nevada, and the laws of Nevada shall govern its interpretation and effect.  The Members consent to the jurisdiction of any Federal or State court located in the County of Clark, State of Nevada for any action commenced hereunder.

Section 11.2   <u>Amendments</u>.  This Agreement and the Articles of Organization may be amended at any time and from time to time by the Majority Approval of the Class A Members. Notwithstanding the above, any amendment hereto which in any way materially and adversely affects the rights or obligations of the Class B Member must be approved in writing by the Class B Member.

Section 11.3   <u>Confidentiality</u>.

(a)   <u>Right to Inspect</u>. The Company shall maintain, at the Company's principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company in accordance with this Agreement. A copy of this Agreement, the Articles of Organization and a current list of Members with the e-mail and/or mailing address of each Member shall be maintained at the principal place of business of the Company and each of the foregoing documents with the exception of the e-mail and/or mailing address of each Class A Member as to which Manager has received specific instructions not to disclose (as provided below), shall be open to inspection and examination by a Member upon ten (10) days written notice to the Company which notice shall include the Member's purpose of such demand.  Notwithstanding any provisions of the Agreement or NRS 86.241 to the contrary, no Member shall be entitled to obtain the e-mail and/or mailing address and/or other contact information for any Class A Member (specifically including the Class A Member's e-mail address, mailing address, fax number and telephone/cellular number) who instructs the Manager in writing not to disclose such Member's contact information to other Members; it being specifically agreed that the Manager shall keep the contact information of those Class A Members who may so elect to be entirely confidential.  Inspections conducted pursuant to

this Section shall be permitted at the principal place of business of the Company between the hours of 9 a.m. and 5 p.m., Monday through Friday.

(b)    <u>Confidentiality and Non Disclosure</u>.    Each member of the Steering Committee, each other Class A Member and the Class B Member (such person, a "**Disclosee**"), during membership in the Company and for a period of three (3) years thereafter, shall hold Confidential Information in confidence and not Disclose Confidential Information to any third person.  Each Disclosee shall use best efforts, but in all events at least the same degree of care in respect to Confidential Information that the Disclosee uses to protect such person's own confidential information from unauthorized use, Disclosure or availability.

(c)    Each Disclosee represents, warrants and covenants that the Confidential Information includes commercially valuable, Company Trade Secrets, the design and development of which reflect the effort of skilled experts and required the investment of considerable amounts of time and money. Each Disclosee further acknowledges that the Company has treated such Confidential Information as confidential and secret information that Company or Manager entrusts to a Disclosee in confidence to use only for the purpose of participating in the Company.  Each Disclosee represents, warrants and covenants that the Company claims and reserves all rights and benefits afforded under all U.S. and international laws or treaties, including, without limitation, patent, copyright and Trade Secret law, in all Confidential Information furnished or otherwise made available to a Member.  In perpetuity, a Member shall not Disclose the Company Trade Secrets to any Person.

(d)    The unauthorized use or Disclosure of any Confidential Information by a Disclosee in violation of this Section 11.3 will cause severe and irreparable damages to the Company, which may be difficult to measure with certainty or to compensate through damages.  If a Member or member of the Steering Committee violates this Section 11.3, the Company shall have all remedies available to the Company at law or equity.

Section 11.4    <u>Defaults</u>.  Should any Member or Manager default under any obligation contained in this Agreement, the Manager or any non-defaulting Member may provide written notice to such party of such default and identify a reasonable opportunity for the cure of such default.  If the default is not cured within the reasonable period of time, the non-defaulting parties may pursue all remedies available under this Agreement, law or equity.

Section 11.5    <u>Notices</u>.  Any written notice to a Member required or permitted under this Agreement shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the date of documented receipt if delivered by standard mail, prepaid overnight courier or e-mail.  Notices to the Company shall be similarly given and addressed to the Company at its principal place of business.  Notices to Members shall be delivered to the addresses on file with the Manager, as may be changed by written notice to the Company and/or the Manager.

Section 11.6    <u>Counsel to Company</u>.  Legal counsel to the Company ("**Company Counsel**") may also be counsel to Manager, any Member or any Affiliate of a Member.  Each Member acknowledges that Company Counsel does not represent any Member in the absence of a

clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member.

Section 11.7    <u>Severability</u>.    If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

Section 11.8    <u>Entire Agreement</u>.    This Agreement contains the entire, integrated agreement of the Members relating to the rights granted and obligations assumed under this Agreement.  Any oral representations or modifications concerning this Agreement shall be of no force or effect unless contained in a subsequent written modification signed by the Members.

Section 11.9    <u>Binding Effect</u>.    Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferee, and assigns as authorized by this Agreement.

Section 11.10    <u>Construction</u>.    Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

Section 11.11    <u>Time</u>.    Time is of the essence with respect to this Agreement.

Section 11.12    <u>Heading</u>.    Article, section, and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

Section 11.13    <u>Incorporation by Reference</u>.    Any exhibit or schedule attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

Section 11.14    <u>Variation of Pronouns</u>.    All pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural as the identity of the person or persons may require.

Section 11.15    <u>Waiver Of Action for Partition</u>.    Each of the Members irrevocably waives any right that it may have to maintain any action for partition with respect to any of the Company Property.

Section 11.16    <u>Counterpart Execution</u>.    This Agreement may be executed in any number of counterparts (including separate affirmation and signature instruments) with the same effect as if both of the Members had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

Section 11.17    <u>Further Documents</u>.    Each Member agrees to perform any further acts and to execute and deliver any further documents reasonably necessary or proper to carry out the intent of this Agreement.

Section 11.18  <u>Attorneys' Fees</u>.  If an action is instituted to enforce the provisions of this Agreement, the prevailing party or parties in such action, including appeals, shall be entitled to recover from the losing party or parties its or their reasonable attorneys' fees and costs as set by the court.

Section 11.19  <u>Legal Representation</u>.  This Agreement was drafted and negotiated by legal counsel employed by an Affiliate of the Class B Member and by legal counsel for an Affiliate of the Manager on behalf of the Manager and the Class A Members.  The other Members of the Company acknowledge and agree that they have had the opportunity to review and discuss this Agreement with their own independent legal counsel and tax and accounting advisors.

Section 11.20  <u>Elections Made by Company</u>.  All elections required or permitted to be made by the Company under the Code shall be made by the Manager on behalf of the Company, subject to Majority Approval, in such manner as in its judgment will be most advantageous to the Company.

Section 11.21  <u>Dispute Resolution</u>.  Any controversy, dispute or claim arising out of or relating to the performance of the Manager or any alleged breach of this Agreement by the Manager shall be resolved in accordance with the terms and provisions of this Section 11.21.

(a)  <u>Agreement to Negotiate</u>.  Before submitting any controversy, dispute or claim arising out of or relating to this Agreement or any breach of this Agreement to arbitration, the following procedures shall be followed:

(i)  The party desiring to submit any such controversy, dispute or claim to arbitration ("**Claimant**") first shall give written notice thereof to the other party ("**Recipient**") setting forth in detail the pertinent facts and circumstances relating to such controversy, dispute or claim;

(ii)  Recipient shall have a period of ten (10) days in which to consider the controversy, dispute or claim that is the subject of the notice and to furnish in writing to Claimant a written statement of Recipient's position with respect thereto;

(iii)  Within seven (7) days of Claimant's receipt of Recipient's written statement, Claimant and Recipient shall meet with a mediator, whose identity shall be mutually agreed upon by Claimant and Recipient, in an effort to resolve amicably any difference that may exist between the respective positions of Claimant and Recipient, and, if such resolution is not achieved, either or both of Claimant and Recipient shall have the right to submit the matter to arbitration.

(b)  <u>Procedure for Arbitration</u>.  Any controversy, dispute or claim arising out of or relating to this Agreement or any breach of this Agreement, including any dispute concerning the termination of this Agreement, that has not been resolved in accordance with Section 11.21(a) (including, the failure to agree upon a mediator within the seven (7) day period described in Section 11.21(a)) shall be settled by arbitration in Clark County, Nevada in accordance with the arbitration provisions of the Nevada Revised Statutes. In arbitration, this Agreement (including this provision providing for arbitration in the event of any controversy, dispute or claim arising out of or relating to this Agreement or any breach of this Agreement that has not been resolved in

accordance with Section 11.21(a)) shall be specifically enforceable. Depositions may be taken and other discovery permitted as provided under the Nevada Rules of Civil Procedure contained in the Nevada Revised Statutes, excluding Rule 16.1.   Judgment upon any award rendered by an arbitrator may be entered and enforced in District Court, Clark County, Nevada.  The prevailing party to an arbitration proceeding commenced hereunder shall be entitled as a part of the arbitration award to the costs and expenses (including reasonable attorneys' fees) of investigating, preparing and pursuing an arbitration claim as such costs and expenses are awarded by the arbitrator.

IN WITNESS WHEREOF, the Manager has executed this Agreement as of the date first above written.

**MANAGER:**

_____, a Nevada
limited liability company

By: _____
    _____, Manager

Exhibit "A" –  Confirmation Order

Exhibit "B" – Property Description - Real Property and Water Rights (if any)

Exhibit "C" – List of Class A Members and Percentage Membership Interest

Exhibit "D" – Business Plan

Exhibit "E" – Initial Project Budget

Exhibit "F" – Initial Members of the Steering Committee

**Exhibit B**
**To Disclosure Statement**

Liquidation Analysis in Chapter 7

| Assets | Value |
|---|---|
| Real Property | $53,000 - $79,500 |
| Cash | $0 |
| Commissions | $2,650 - $3,975 |
| Trustee Fees | $5,900 - $7,225 |
| Total Assets in a Chapter 7 | $44,450 - $68,300 |

| Liabilities | Amount | Chapter 7 Recoveries | Recoveries under Plan |
|---|---|---|---|
| Class 1 (Property Taxes) | $0 | $0 | $0 |
| Class 2 (Note Claims) | $2,580,000 | $44,450 - $68,300 | $1,534,333 - $2,297,533[1] |
| Class 3 (Old Membership Units) | n/a | $0 | $161,667 - $246,467 |

---

[1]Recoveries are calculated by assuming that the Property will be sold at its going concern value on the fifth anniversary of the Effective Date. In addition, carry costs are assumed to be equal to the cost of property taxes and Management Fees during that five year period (but excluding the first year because the Parent is contributing an amount estimated to cover those costs with only a portion being ultimately recovered as capital). However, recoveries would be reduced by any other carrying costs expended, as well as any industry standard commissions and closing costs of any sale incurred.